## UNIVIS CORPORATION et al. v. RIPS et al.
## SAME v. GRIMSHAW.
### Nos. 7594, 7595.

Circuit Court of Appeals, Sixth Circuit.

May 3, 1939.

H. A. Toulmin, Jr., of Dayton, Ohio (H. A. Toulmin and H. A. Toulmin, Jr., both of Dayton, Ohio, and Ralph Routier, of Detroit, Mich., on the brief), for appellants.

Victor D. Borst, of New York City, and Otto F. Barthel, of Detroit, Mich. (Victor D. Borst, of New York City, and Otto F. Barthel, of Detroit, Mich., on the brief), for appellees.

Before HICKS, SIMONS, and HAMILTON, Circuit Judges.

HICKS, Circuit Judge.

Separate suits by appellants against Paul Rips and Rips Optical Company and against Charlotte M. Grimshaw, an employee of Rips, for infringement of Patents No. 1,899,777 issued February 28, 1933, to Stanley; and No. 1,912,165 issued May 30, 1933, to Silverman.

Infringement is conceded. The District Court found both patents invalid for want of invention. The cases are here on one record. All claims of both patents are in issue.

These patents relate to bifocal lenses for spectacles or eye-glasses.

Bifocal lenses are very old. It appears that the earliest such lens was contrived by Benjamin Franklin, who mounted two separate lenses, one above the other, in a single frame. One advance beyond the Franklin arrangement retained the bifocal feature by grinding the upper and lower parts of a single lens to different curvatures; another restored the dual lens but inserted the minor one as a plug in a hole ground in the lower part of the major one or cemented it on the major one. Later the idea was developed of grinding a recess into a piece of ordinary lens material such as crown glass of suitable dimensions and fusing therein a piece of glass of different ingredients and hence of different refractive power. See Patent No. 876,-933 to Borsch, January 21, 1908. The whole was then ground and polished on both surfaces. An example of this is the familiar Kryptok.

Courmettes No. 1,160,383, issued November 16, 1915. Courmettes ground a recess into the major lens and also used the fusion process, as did Borsch, but he prepared the blank for the minor lens out of two blocks of glass of different refractive power, which he fastened edge to edge. The upper block was of the same refraction as that in the major lens but the lower was denser. When the blank was fitted to the recess of the major lens, fused in, ground down and polished, the result was startling. The upper half of the minor lens, being composed of glass like that of of a major lens, merged with it and neutralized. The lower half of the insert, of different refraction, alone remained visible and appeared "in the finished lens as a half circle minor portion, the optical center of which being on the line dividing the bifocal surface."

Courmettes' object was to eliminate both double vision and chromatic aberration and he found that this could be achieved by providing that "the line dividing the different refractive portions, should pass through the exact optical center of the minor lens." The minor lens "feathered out" along its half circular edge but presented a thick, straight, shoulder along its horizontal upper edge.

Tillyer No. 1,544,612, issued July 7, 1925 (reissued), utilized the fusion or cementing process in the more particular placement of his minor lens to "eliminate to a very great degree the jump or displacement of the image as the eye passes over the line of division between the two portions of the lens" and to vary the *"relative position of the centers of the near and distant portion * * * without affecting the general appearance of the lens. * * *"* (Italics ours.)

Tillyer amplified the above statement as follows: "Prior to this invention it has been customary in the construction of two part bifocals, as for example, in what is commonly called the Kryptok lens, to make use of a major portion of one refractive index and a minor portion of a different refractive index, a countersink for the minor portion being formed in the major portion and having its thinnest point * * * disposed at the geometrical center of the countersink. *Bifocals of this type when completed have had the center of the reading portion therefore disposed way down into the reading portion. It is one of the purposes of the invention to obviate the difficulties present when the center is so positioned by providing a construction in which the center is near but preferably not on the line of division between the two fields. * * *"* (Italics ours.)

This was a decided advance in the art. In achieving his objectives, Tillyer used a minor lens of different refraction and fixed it into a recess ground in the major one but his means were not Courmettes'. He fashioned his insert blank in circular form but larger than the recess, then reduced its size and in doing so ground its edges eccentrically with reference to its optical center so that the latter lay near one edge of the final circular insert blank. To receive it, the recess in the major lens was ground on an angle so that it was deeper toward the center with a thick shoulder thereat, graduating to no depth

at all at the point near the bottom of the major lens. The insert was fitted into this recess with its optical center nearest the shoulder. Fused on, ground down and polished, the minor portion had "a thin lower edge blended into the finished curve and * * * *a thick shouldered upper edge lying below the optical center of the major portion and above the optical center of the minor portion."* (Italics ours.)

In Courmettes the optical center of the lower lens coincided with this shoulder. Tillyer placed the optical center of the minor lens below this shoulder. He knew the desirability of providing a thick shoulder between the optical centers of the two lenses to eliminate "figure jump" and as an expedient for bringing the two centers closer together to reduce eye movement from one to the other.

Tillyer made it clear that he had the choice of placing the optical center of the minor lens either on the line of junction or near it. He preferred the latter. He knew how to shift the center so that the position of greatest comfort in his type of lens could be determined by experiment. It was simply a matter of positioning and was achievable by varying the size, location or depth of the recess; varying the size of the original insert blank and of shifting the eccentricity in cutting the final insert to bring its optical center nearer or farther from its edge. The disclosures of his patent made all these variations easily possible.

Tillyer also disclosed a method for making a lentil-shaped minor lens to widen the "field of vision for reading without the superfluous height which is not required for the purpose, and possessing the extra advantage that the finished lens may be cut * * * to leave a small zone of the distance curve" beneath "suitable for vision in going up and down stairs. * * *"

Patent No. 1,632,208 was issued to Watson and Culver on June 14, 1927. It utilized the Courmettes' type insert blank, except that the Watson and Culver blank was "preferably * * * made in three parts, a central portion and two segments." The outer segments had substantially the same refractive index as that of the main lens and neutralized with it. "The central portion has a refractive index greater than that of the other portions and is suitable for forming a reading portion." The edges between the segments were left grey and unpolished to prevent the dividing

shoulders from acting as reflectors. Fused on to the major lens, the center reading segment became the minor lens with horizontal upper and lower shoulders and arcuate ends. In the diagram its length was, roughly, twice its height.

We quote from the specification: "* * *It is found in practice* that the lower part of the plate is little if at all used for reading purposes and it is the lower portion which prevents the wearer from seeing the ground. It has also been found that the upper portion of the plate is little if at all used in reading, and that the eye adjusts itself to the use of a comparatively narrow part of the circle which is of greater width, that is to say, a part on each side of the horizontal diameter of the circle." (Italics ours.)

The patents we have referred to substantially disclose the prior art.

Claim 2 of the Stanley patent is printed.[1] The advantages claimed for Stanley are recited in the specification which we quote: "The resulting lens of my invention has the very substantial advantage of wide lateral, long distance vision on either side thereof, easy long distance vision above the flat top of the insert, a very deep reading area *with sufficient space below this reading area* for long distance vision as in walking upstairs. * * *"

The Stanley insert was formed of two blocks of glass, as in Courmettes, and was joined to the major lens in the same way, its chief differences consisting of its size and shape and position.

Stanley is not precisely anticipated but all its technical advantages, except the horizontal shoulder or "the flat top of the insert," are recognized and incorporated in Tillyer; and both Courmettes and Watson had the flat top.

■ Appellants owned the Watson and Culver patent and used it in making their "B style" segment. This was unsatisfactory. Customers complained of a lack of vertical reading field and of the reflection from the lower shoulder. Silverman, who was General Manager of the Univis Lens Company, a licensee of one of appellants, in his testimony in the interference with

Wells said, with reference to Stanley, that around March 1, 1927, Stanley said that "he was going to increase the vertical dimension of the reading insert to eliminate the complaints that we were having on B lens. At that time we were receiving numerous complaints from our customers stating that the vertical reading field of our B style was not large enough. They also complained of a reflection caused by the lower straight edge of the reading section. * * *" Indeed, Collinson of the American Optical Company suggested how these objections to the B type lens could be met, namely, "by continuing the round sides of the B on down to practically the very bottom."

In other words, the remedy was obvious. It involved, simply, the replacement of the lower segment of the Watson and Culver insert with the denser glass of the middle segment. To do this does not connote invention. In view of Courmettes and Tillyer, it involved no more than the skill of an expert.

■ Appellants urge that the commercial success of Stanley was marked but commercial success alone will not balance the scales in favor of invention.

The Silverman patent provided a bifocal with a crescent shaped reading lens with the points turned up. The insert was positioned on the major lens to provide "a lower relatively far vision section which gradually widens until it merges into a very large distance seeing section above the insert. A lens constructed in this manner has all of the advantages of a lens without an insert for distance vision, and at the same time * * * ample reading qualities." The specification also declared that—"A person using this lens can see at each side, above and below at a distance as well as if there were no insert."

■ Silverman differed from Stanley in that he provided a concave curve with the points up instead of the horizontal shoulder for the upper edge of his reading lens. This afforded a deeper field for distance views through the depressed part of the upper curve of the reading lens and was, as we see it, *its only advantage;* and like

---

[1] "2. In a lens, a major lens and an insert of different glass from the major lens, *said insert consisting of a circular member less than a full circle with a flat top, the vertical dimension thereof being greater than the radius of the circle but* *less than the diameter of the circle,* said insert being spaced from the bottom and side walls of the major lens to permit vision on either side and below as well as above the insert." (Italics ours.)

Stanley, did not involve invention. It was what a mechanic, skilled in this field, might do to meet the needs of spectacle users. The method of making a lens with a curved upper edge was revealed in Tillyer No. 1,588,783, June 15, 1926, the only difference being that the upper edge of Tillyer curved downwardly instead of upwardly. If there was any invention it lay in the novel shaping and positioning of this insert, but the possibilities for variation in shaping and positioning were innumerable once the manner of doing so was revealed and we hardly think that every fresh effort which results in a new shape or position for the insert can be said to amount to invention.

The decree is affirmed.