## WILLIAMS MFG. CO. v. UNITED SHOE MACH. CORPORATION.

No. 8438.

Circuit Court of Appeals, Sixth Circuit.
June 27, 1941.

H. A. Toulmin, Jr., of Dayton, Ohio (Dolle, O'Donnell & Cash, of Cincinnati, Ohio, Toulmin & Toulmin, of Dayton, Ohio, James B. O'Donnell, of Cincinnati, Ohio, and H. A. Toulmin, H. A. Toulmin, Jr., and Rowan A. Greer, all of Dayton, Ohio, on the brief), for appellant.

Harrison F. Lyman, of Boston, Mass. (Harrison F. Lyman, Charles E. Hammett, Jr., and Fish, Richardson & Neave, all of Boston, Mass., on the brief), for appellee.

Before SIMONS, HAMILTON, and MARTIN, Circuit Judges.

SIMONS, Circuit Judge.

Certain of the claims of two patents in the shoe-making art were held below to be

valid and infringed by a number of machines purchased abroad by the appellant and used by it in the United States. The appellant assails the decree in respect both to its adjudication of validity and infringement.

The patents in suit are McFeely, No. 1,-558,737, for a lasting machine, granted October 27, 1925, and Hoyt, No. 1,508,394, for a fastening inserting machine, granted September 16, 1924. Both inventions concern themselves with improvements in machines for lasting heel seats of shoes of various shapes and sizes. Of the two the McFeely combination is the more comprehensive, clearly the more important in the development of the art, and its adjudication more vital to the determination of the controversy, since Hoyt is concerned with a relatively minor improvement in machines of the type embodied in the McFeely invention.

In the McFeely machine, as it is described in the specification and the evidence, and as demonstrated, the shoe upper, with its lining and counter assembled on a last, is placed on a pivoted jack with the bottom uppermost. An insole has been tacked to the last and the upstanding edges of the upper at the toe and shank of the shoe have already been flattened down and attached to the insole. The heel seat lasting, which is to be done on the machine, involves conforming the upper materials snugly to the contour of the heel end of the last by an operation called "wiping," which consists of flattening the marginal portions of the upper, counter and lining down on the insole and then fastening them in lasted position. To accomplish this the jack is swung toward the machine into a "heel band" and under what is known as a "hold-down," which is a vertical movable member that governs the vertical position of the shoe in the machine. The machine is placed in motion by tripping a treadle, and power operations take place in following sequence. The jack is pulled farther into the machine to seat the shoe snugly against the heel band, the shoe bottom is pressed against the hold-down so that the last and shoe are forced downwardly to place the insole below the plane of elements called "wipers." The wipers are then automatically advanced to close over the bottom of the last to break down the upstanding edges of the upper, counter and lining over the insole surface. The wipers are then retracted and the first

wipe is complete. The jack and last are then pulled back tighter into the heel band and forced upward more firmly against the hold-down to position the shoe with the surface of its insole substantially in the plane of the wipers. These are now caused to again advance and close for a second wipe which is called "ironing." Retraction of the wipers again follows, and upon their final advance they confine the lasting allowance against the insole while tacks are automatically driven through the materials to hold them in place on the insole. The heel band then opens, the jack is lowered, the wipers and tackers are withdrawn and the jack swings out of the machine so that the operator may remove the shoe and present another assembly for lasting.

While these operations require extended description the entire sequence is completed in the fraction of a second and too swiftly for the eye to follow. It is said that the heel seat lasting operation is a delicate and important one, and that there must be an accurate fit so that the heel of the shoe may subsequently be applied without any looseness in the upper material. It is to attain this objective that there must be the first wiping operation with the wipers somewhat above the plane of the insole and the second wiping or ironing operation in substantially the same plane.

It is contended by the appellant that essentially all of the elements of the McFeely patent are old, that they are combined and function in manner taught by the prior art, and that what the inventor claimed as improvements were merely details in a complicated machine, the equivalents of which have been used in the same way for the last sixty years. It points to the patent to Copeland, No. 244,714, as the basic patent in a crowded art, and as disclosing the first machine for automatically performing heel seat lasting by wiping the leather of the heel and toe across the bottom of the last while tacks are inserted to hold the leather in position after it has been wiped. It traces the development of the art, since Copeland, through the patent to Lombard, No. 524,445, as one describing a mechanism for automatically adjusting the position of wipers to varying contours with means for adjusting the machine for different sizes of shoes; through the patent to Eaton, No. 596,323, which describes a machine of the class known as "bed lasters" wherein tacking is performed by hand instead of carry-

ing the tackers on the wipers; through the patent to Pym, No. 1,368,868, another "bed lasting" machine without automatic tackers, and urges that the bed lasters do everything that the patent in suit performs and include means for a predetermined adjustment of the wipers; that the patent to Plant, No. 958,280, discloses in precise detail the means of the patent in suit for adjustably supporting the heel band, and that Brock, No. 1,188,616, demonstrates that it is old to provide means for applying pressure to the back and sides of the heel band for adjustment purposes. Principally, however, is reliance placed by the appellant upon an earlier patent to McFeely, No. 1,-129,881. This is claimed to be a complete anticipation in all essential elements, in manner, of their functioning, and in results. It is now expired and the appellant states the fundamental issue here to be whether the appellee may now extend its monopoly by substituting in an old construction equivalent mechanical details also old in the art and so to get a new patent for another 17 years. Its own machines, the appellant urges, do not infringe because they follow the plaintiff's own expired McFeely and Pym patents, and likewise because they are fundamentally different in construction and operation from the McFeely patent in suit.

The origin of the defendant's machines, the circumstances of their appearance in this country, and the efforts made to avoid the charge of infringement after notice, are illuminating and raise inferences in respect to infringement which may not be dispelled except upon clear and convincing evidence of fundamental differences between them and that disclosed in the second McFeely patent. The defendant purchased four "Calzera" automatic machines from Moenus Machinen-fabrik in Frankfort, Germany. It seems reasonably clear, from the general appearance of the accused machines, and as they are depicted and described in the Moenus catalog, and from the evidence of the defendant's witness Kath, a mechanical engineer engaged on patent work for the Moenus Company who came from Germany to help in the preparation of the trial and whose duty it was to study shoe machinery patents including those granted by United States, and who saw one of the McFeely machines in Germany and was familiar with the patent drawings and specifications, that the Moenus machines are copies of the commercial construction of the plaintiff. They followed this construction even in minor detail not shown in the patent, and the improved results claimed for it by the inventor over machines of the prior art are enthusiastically proclaimed in the Moenus catalog. After notice of infringement was served upon the appellant, there were removed from its machines certain wing screws, clips and a form of adjustable stop, some upon the advice of counsel and all in the hope clearly indicated that the changes might avoid a finding of infringement.

These implications do not, of course, either preclude or excuse us from detailed consideration of alleged differences between the accused devices and the disclosures and claims of the patent, or of their identity. Such consideration as we are able to give to the various elements and their function in tracing them through the maze of drawings and photographs that have been submitted to our inspection, requires a holding of infringement if the claims be valid. The wipers and tackers of the accused structures are fixedly connected as in the patent. While the tacking in the infringing devices is through the wipers, whereas McFeely disclosed tacking at a predetermined distance beyond the edge of the wipers, his claims are without limitation in this respect and the choice is but between known expedients in the art, nevertheless it is but another indication of copying that the assailed machines follow the commercial practice of the plaintiff rather than the preferred method disclosed by the inventor. The fixed connection between wipers and tackers is, however, present. Although in the defendant's machines the wipers and tackers are bolted to carrier plates, these are within the language of claims 6 and 85 printed in the margin,[1] as "tacking units co-operating with the wiper plates and having means to

---

[1] Claims 6, 85—

"6. A machine of the class described having, in combination, end lasting wiper plates for closing over a last bottom, manually operable means determinately to adjust the positions of the wiper plates to initially position the wiper plates to act on the marginal portions at the end of a shoe upper mounted on the last, means to effect bodily and swinging movement of the wiper plates to wipe said marginal portions over the bottom of the last into position to be fastened on the bottom of the last, and tacking units co-operating

maintain them in predetermined relation to the wiper plates in all positions of adjustment," and "tackers connected to the wipers for preliminary adjustment with them and for power effected movement with the wipers."

Claims 23 and 91, likewise printed in the margin,[2] are also infringed. Such infringement is not avoided by the removal of the wing screws and clips of the accused organization prior to suit, for here is not a case of alleged infringement, inadvertent or of unsubstantial character and long-abandoned as led to the denial of an injunction in Lester v. American Rolling Mill Co., 6 Cir., 95 F.2d 772. Likewise is general claim 42, also printed in the margin,[3] infringed. While there was sharp conflict in the testimony, the District Court [29 F. Supp. 1015, 1016], found that the element "manually adjustable means for determinately varying the amount of vertical movement of the hold-down" was present at the time of plaintiff's inspection, and moreover that the substitution for this element fulfilled the same function. In consideration of inferences that support the findings of the District Judge, who, having seen and heard the witnesses, has superior advantages for ascertaining the truth, we are unable to say that his finding in this respect is clearly erroneous.

---

with the wiper plates and having means to maintain them in predetermined relation to the wiper plates in all positions of adjustment of said plates."

"85. In a machine of the class described, the combination with last and shoe positioning means, of end embracing wipers, means for effecting a preliminary adjustment of the wipers to the contour of the shoe, additional power means for subsequently operating the wipers, and tackers connected to the wipers for preliminary adjustment with them and for power effected movement with the wipers subsequently over the shoe."

[2] Claims 23, 91—

"23. A lasting mechanism of the class described having, in combination, a substantially U-shaped flexible clamping member to embrace one end of a last and shoe upper, means to support a last and shoe upper with one end positioned within said clamping member, a movable adjusting member connected to the lower edge of said clamping member at its rear closed end, means to support the lower edges of said clamping member at opposite sides, pressure members arranged to engage the opposite sides of the U-shaped clamping member at points above its lower edges and to press said sides inwardly to force the end of the upper in close conformity to the last, manually operable means to move said adjusting member to slide the U-shaped clamping member relatively to said pressure members, means to operate said pressure members to clamp the shoe upper, and end wiping mechanism to wipe down the edges of the upper over the bottom of the last."

"91. In a machine of the class described, the combination with last and shoe positioning means, of an end embracing band for clamping the upper round the lateral periphery of an end of the last, supporting means relatively to which the opposite side portions of the band are permitted to slide lengthwise of the shoe, and means connected to the end portion of the band for adjusting it lengthwise of the shoe and relatively to said supporting means."

[3] Claim 42—

"42. A machine of the class described having, in combination, clamping means to embrace one end of a last and shoe, end wipers positioned to operate on the edges of the upper at said end of the shoe, a hold-down mounted for vertical movement and position to engage the bottom of the last and shoe, a support for a last and shoe constructed and arranged for manually effected movement to engage the last and shoe with said clamping means and hold-down, power operated mechanism effective to move said support forcibly to press the last and shoe against said clamping means and hold-down and to actuate the clamping means, mechanism effective in timed relation to the clamping means to depress the hold-down and support to position the shoe bottom determinately below the plane of the wipers, mechanism operative to actuate the wipers to break down the edge of the upper over the bottom of the positioned last and shoe, the said hold-down mechanism being automatically operative subsequently determinately to raise the hold-down, the said power operated mechanism being operative substantially coincidentally correspondingly to raise the said support to engage the bottom of the last and shoe with said hold-down with the shoe bottom positioned substantially in the plane of the wipers, and the end wiper mechanism being subsequently operative in timed relation to wipe over and compact the broken down edge of the upper over the bottom of the last and shoe, and manually adjustable means for determinately varying the amount of vertical movement of the hold-down."

But obvious as infringement of a patent may appear to be, the utilization of its disclosures pays no tribute to its validity, however much it concedes utility, for the copying of a patented thing may, in the last analysis, be but a challenge to monopoly boldly asserted by the infringer on behalf of himself and the public, and an invitation to the patentee to vindicate his patent by judicial test. Retreat, however, in the face of notice of infringement wears a different aspect, and if not precisely a concession of validity, it implies at least some doubt as to the soundness of the challenge and the faith of the challenger in the strength of his position.

■ The appellant urges the first McFeely patent as complete anticipation of the claims of the patent in suit. It is without doubt its most pertinent reference. But the first McFeely patent was before the patent office for consideration on the second application and there is no indication that McFeely experienced unusual difficulties in the pursuit of the patent in issue. We are, therefore, obliged to give consideration to the rule that "one otherwise an infringer who assails the validity of a patent fair upon its face bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance. Cf. Philippine Sugar E. D. Co. v. Philippine Islands, 247 U.S. 385, 391, 38 S.Ct. 513, 62 L.Ed. 1177." Radio Corporation v. Radio Laboratories, 293 U.S. 1, 8, 55 S.Ct. 928, 931, 79 L.Ed. 163. To the presumption of validity that attaches to a granted patent, where the most pertinent prior art has been cited against it in the patent office, there must probably now be added the force of a growing recognition of finality that is generally being accorded to administrative determinations supported by evidence, on the ground that the administrative agency is expected to have developed an expertness in its specific field beyond what may be expected from the courts wherein adjudications range the whole field of human controversies. It is true, of course, that in the most strict sense, the granting of a patent is not, except when an interference is declared, the result of an adversary proceeding, as in usual administrative determinations of agencies exercising quasi-judicial functions. Nevertheless, it wears, in the broader sense, an adversary aspect, since patent office examination protects the public against unmerited monopoly, and so the public, as represented by the examiner, is always impliedly in adversary position to the application just as it is ever a third party to an infringement suit. Kellogg Switchboard & Supply Co. v. Michigan Bell Telephone Co., 6 Cir., 99 F.2d 203. To the inferences in support of validity thus noted, must now be added the implication of correctness that attaches to the findings and conclusions of the District Judge who heard the testimony of the witnesses and saw the machines in operation.

■ The plaintiff contended below, and the court found, that the McFeely patent in suit was the first automatic heel seat laster which ever went into commercial use. This finding was promptly challenged by the appellant with the request that it be permitted to reopen its case and introduce the file-wrapper of the first McFeely patent, to disclose a supplementary oath of McFeely reciting that a full-sized operative machine was constructed in accordance with the detailed drawings of the patent and had been employed for lasting heel seats in the ordinary course of manufacture of many pairs of shoes; and to disclose that the affidavit was in support of statements by plaintiff's attorneys in pursuit of the application, that the applicant was the first inventor to have produced a successful heal seat lasting machine. While this evidence was rejected in the court below, as offered too late, we have given it consideration, and see no reason for remanding the case to the District Court for such bearing as it may have upon decision. McFeely was not the first, as undoubtedly he will not be the last inventor to claim merits for his invention not capable of realization when the patent is fully exploited under competitive conditions of commercial manufacture. The statement in the file-wrapper is little more than what is required to satisfy the patent office that there has been a reduction to practice, without which there is but an unpatentable concept, and while the court's finding in respect to the pioneer character of the second McFeely invention may be somewhat of an over-statement, yet, in the light of the uneventful story of the first McFeely invention, it is substantially accurate.

The first McFeely patent contributed little to the art. But one machine was ever built in accordance with its disclosures and this was sent by the appellee to the

Victor Shoe Company for test in the lasting of heel seats under commercial conditions, subject to an arrangement by which no charge should be made to the Victor Company for the work done on the machine, and that any shoes spoiled in its operation should be paid for by the appellee. Although the machine successfully lasted shoes of specific sizes, it proved incapable of operating satisfactorily upon a range of sizes large enough to adapt it for commercial operation in the ordinary shoe factory, and after it had been tested for a period it was returned to the manufacturer, was dismantled, and no other similar machine was ever built. On the other hand, the automatic heel lasters of the patent in suit have gone into wide use, the court finding that more that 1,200 of such machines had been in operation throughout the world, and both litigants agree that they are complicated and expensive. Between commercial success demonstrated by brief use of a single machine abandoned and not duplicated, and commercial success of the machine of the second patent, there yawns a wide gulf not to be bridged merely by insistence that the second McFeely patent advanced the art but in minor and inconsequential details.

■ The challenge to the validity of the patent in suit on the ground that it discloses but an aggregation within the principals applied in such cases as Grinnell Washing Mach. Co. v. Johnson Co., 247 U.S. 426, 38 S.Ct. 547, 62 L.Ed. 1196 (the washing machine and wringer), or Detroit Stoker Co. v. Brownell Co., 6 Cir., 89 F.2d 422 (the stoker and blower), is not persuasive. It is true that many of the features of the claims are old and that an organization, including wipers and tackers, was shown in somewhat primitive form in Copeland. It is also true that adjustability of elements, thought not in the form shown in the first McFeely patent, is added by the patent in suit to the McFeely type laster, and that mere adjustability by common mechanical expedients may not, of itself, denote the presence of the quality of invention and merit the issue of a patent. But to reduce the second McFeely patent to a mere aggregation of tacker and the old form of bed laster, or to consider it as merely the combination of the first McFeely patent and conventional expedients for adjustment, is to ignore matters of substance.

The patent in suit, unlike its predecessor, provides not only for a preliminary adjustment of the wipers but for the maintenance of the tackers in relation thereto. The tacking occurs before the final withdrawal of the wipers, eliminating the tendency to pull the material to be tacked from its wiped position. The heel band of the first McFeely machine was loose and without support and incapable of sliding movement. Upon the withdrawal of the shoe the heel band was ejected as the result of the release of spring tension upon a plurality of cords. There was absent in the prior McFeely machine, means for adjusting the vertical movement of the hold-down that are present in the patent in suit. Taken together, the improvements in the second McFeely machine gave a new result and a new unitary mode of operation of the entire machine. There is here much more than mere improvement in quality or quantity of product due to the independent functioning of an improved element, as in Bassick Mfg. Co. v. Hollingshead Co., 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251, or Kodel Elec. Co. v. Warren Clock Co., 6 Cir., 62 F.2d 692.

■ The patent in suit is not merely the aggregate of laster and tacker, and the disclosed improvements upon prior art are not limited to the addition of adjustability. We pointed out in Detroit Stoker Co. v. Brownell Co., supra, that while addition of adjustability alone to a machine or an element thereof which entails no exercise of the inventive faculty will not rise to the dignity of invention, there are patents wherein provisions for adjustability are not only novel but disclose the highest type of inventive thought and solve problems which long defied workers in the art. The respective history of the two McFeely machines place the patent in suit in the second of the categories discussed in the Stoker case. It is not to be struck down by the familiar expedient of picking out old elements of the prior art and speculatively combining them when in practice they have never been combined, though the need for a machine of the type disclosed had long been recognized. The claims of McFeely in suit are valid and infringed.

It may be of little importance in this controversy to adjudicate the validity of the Hoyt patent after upholding validity and infringement of the claims of McFeely,

since the four machines of the appellant are accused of infringing both, and it is not probable that royalties would be cumulated. However, recent experience, Cleveland Trust Co. v. Schriber-Schroth Co., 6 Cir., 108 F.2d 109, dictates it to be the more prudent to adjudicate all issues submitted to us.

Hoyt concerns itself specifically with improvements in means for adjustment of the heel band in machines of the McFeely type. Claims 19 and 21, printed in the margin,[4] are in suit and cover subject matter corresponding to that which is included in claims 23 and 91 of McFeely. The pressure plates of McFeely, operating upon the heel band, are capable of yielding by reason of opposed springs. These Hoyt has omitted. Whereas McFeely employed a unitary spring at the bight end of the band, Hoyt uses separate arms loosely mounted, carrying pressure members rendered yieldable by springs. Yieldability is thus transposed from the bight ends of the band to its center. This simple reorganization of the heel band mechanism may afford greater adjustability or flexibility of the member, but it requires no reorganization of the machine nor any new mode of operation, and whatever improvement may result is due entirely to the improved element and cannot give rise to valid claims embracing the entire lasting mechanism. The principle sought to be applied by the appellant to McFeely, and by us in respect to it, rejected, is clearly applicable to Hoyt under the rule of Bassick Mfg. Co. v Hollingshead Co., supra; Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008; General Motors Corp. v. Rubsam Corp., 6 Cir., 65 F.2d 217, 220; Detroit Stoker Co. v. Brownell Co., supra. The Hoyt claims in suit are invalid.

The decree below will be amended to strike therefrom the adjudication as valid and infringed claims 19 and 21 of Hoyt, and directing as to them that the bill be dismissed. So amended the decree below is affirmed.

HAMILTON, Circuit Judge, dissents.

---

4 Claims 19, 21.

"19. In a machine of the class described, the combination of fastening inserting means, means for positioning a shoe in relation to the fastening inserting means comprising a substantially U-shaped flexible band operable to clamp the heel end of the shoe, an operating member and unyielding connections between said member and the band for forcing the ends of the band against the shoe, and separate yielding means operating on each side of the band adjacent to the bight of the band to press such portions of the band against the shoe."

"21. In a machine of the class described, the combination of fastening inserting means, means for positioning a shoe in relation to the fastening inserting means comprising a substantially U-shaped flexible band operable to clamp the heel end of the shoe means for supporting the band, devices comprising arms loosely mounted on the supporting means, and means normally operative to press said devices against the land."