### CLEVELAND PUNCH & SHEAR WORKS CO. v. E. W. BLISS CO. et al.

### SAME v. MARQUETTE TOOL & MFG. CO.

### SAME v. E. W. BLISS CO. et al.

### E. W. BLISS CO. et al. v. CLEVELAND PUNCH & SHEAR WORKS CO.

### Nos. 9748–9751.

Circuit Court of Appeals, Sixth Circuit,
Dec. 7, 1944.

992

Victor D. Borst, of New York City, for Cleveland Punch & Shear Works Co.

Albert R. Golrick, of Cleveland, Ohio (Horace B. Fay and Albert R. Golrick, both of Cleveland, Ohio, on the brief), for E. W. Bliss Co., Toledo Machine & Tool Co., Frederich J. Rode, and Marquette Tool Mfg. Co.

Before HICKS, SIMONS, and HAMILTON, Circuit Judges.

SIMONS, Circuit Judge.

Since patents in all four cases relate to drawing presses for shaping large sheet metal structures such as the roofs, fenders, and body panels of automobiles, and since the patents are owned by the Bliss Company and its affiliates, and the alleged infringer is the same in each of the cases, economy of time and space will be served by disposing of them in a single opinion, although they were briefed and argued as separate cases and the single continuous record made below was separated for the purpose of appeal, with a stipulation, however, that the testimony and exhibits were to be interchangeably useable and applicable in all cases.

## No. 9748

This case involves patent No. 1,918,784 to Frederich J. Rode for a sheet metal drawing press, issued July 18, 1933 upon an application filed April 11, 1932. No issue of infringement being raised by the defendant's answer and proofs, the controversy is limited to the validity of claims 2, 5, and 7 relied upon by the plaintiffs. Upon findings and conclusions of a special master, affirmed by the court, that the claims in suit were valid, the usual decree for injunction and accounting for damages was entered.

While the Rode patent is directed to a sheet metal drawing press, the claims in suit, of which claim 2, printed in the margin,[1] is sufficiently typical, relate more specifically to a gearing for the transmission of power appropriately controlled from a conventional source to a type of press well known in the art. Presses of the type described in the patent are driven by the kinetic energy stored in a motor-driven flywheel. Since the nature of the process involved in shaping large sheets of thin steel is such that the metal must be caused to flow to a considerable extent, and since the die mechanism carried by the ram or slide must be accurately driven and accurately registered with the lower die mechanism, the press must operate at a speed much slower than the speed of the flywheel. The usual practice had been to use a small gear on the power shaft meshing with a large "bull" gear on the crank shaft to secure desired speed reduction. In the case of four-point presses, such as in the patent described, which have two crank shafts each supporting two plungers so as to give a four-point drive to the slide, the usual expedient had been to mesh two bull gears, of equal size, so that the crank shafts would turn in opposite direction at equal speeds. A difficulty perceived in this arrangement resulted from the fact that one bull gear was both a driven and a driving gear, while the other was driven only. The driving gear was found to wear faster than the other, resulting eventually in the two crank shafts being sufficiently out of time to cause a slight tilting of the slide and thereby destroying the accuracy of the press. It was well understood that this unequal wear could be minimized by increasing the size of the bull gears, but such increase was subject to limitation by considerations of available space, and since the crank shafts of meshing gears must be separated by the diameter of the gears, no flexibility of design was permitted.

Rode claimed to have solved this difficulty by providing bull gears which are driven by smaller intermediate gears so that the bull gears need not mesh but may overlap. This arrangement permits the use of considerably larger bull gears without enlargement of the press, and permits of greater flexibility of design since the crank shafts need be separated by little more than the radius of the bull gears. This greatly minimizes, if it does not eliminate, inequality due to wear, because the inequality becomes negligible by reason of the size of the gears.

Rode attempted to patent his complete concept, but his original claims were rejected on the ground that the use of large gears to offset wear, was old in gearing. He then limited his application to a construction which eliminates idler shafts by mounting the intermediate gears loosely on the crank shafts, and claims so limited were allowed. For his precise arrangement of the gear train there is no complete an-

---

[1] "2. In a metal drawing press a reciprocable ram, spaced parallel crank shafts, links connecting the ram with said crank shafts, bull gears secured to each of the shafts, the pitch line radii of said bull gears being greater than the distance between the axes of the shafts and a medial plane between the said axes, intermediate gears between each of the bull gears and the opposite crank shaft, said intermediate gears being rotatably mounted upon the crank shafts, a power shaft, and a gear connection between the power shaft and one of the aforesaid gears."

ticipation in prior art. However, in presses made for the A. O. Smith Corporation of Milwaukee, Wisconsin, by the Allis-Chalmers Manufacturing Company, and used for several years prior to Rode, unmeshed bull gears were driven by intermediate gears to avoid tilting of the slide and achieved a saving of space, at least in the fore and aft dimension, together with flexibility of design in mounting the crank shafts. The Smith press was, however, only a single end drive, with only one bull gear on each crank shaft, instead of two. It is admitted, however, that Rode was not the originator of the double end drive, and the question is therefore presented whether Rode demonstrates such advance over the Smith use as to denote invention, the advance being the elimination of idler shafts, which permits a saving in the height of press and some slight saving in its cost of construction.

It was old, however, to mount intermediate gears on the main shafts instead of on back shafts, for it appears in Wood patent No. 280,705, allowed July 3, 1883, for a cane mill. This may well be considered remote art, suggesting nothing to Rode. But in 1887 Essex, in patent No. 374,146, described fully the generic class of multiple gearing of which Rode is but one species. His invention consists, in its broadest features, of a driving gear wheel, a double gear wheel, or a series thereof carried loosely on the support with the driving gear wheel, the double gear wheels having large and small portions and a similar double gear wheel or series thereof on another support, the large portions of one series engaging with the small portions of the other series. He explained that the starting and ending gears can both be fastened to their respective shafts, or one can be fastened and the other loose, or both can be loose, in which case the intermediate double gears may, if desired, be fixed to their shafts. The Essex invention was not limited in applicability to any specific type of operative apparatus, but was addressed generally to the machine arts disclosing an improved form of mechanism for converting motion equally available where initial speed in transmission is to be multiplied or reduced, as circumstances may require.

Essex is indubitably prior art. Substantially it covers the whole field of transmission by means of multiple gears in controlling initial speed derived from any power source. The defendant's expert gave complete demonstration that multiple gears may be arranged in a train in a myriad of forms from which appropriate selection may be made for any required purpose. Giving consideration to the modern development in the machine arts and the schooling of mechanics engaged therein, and giving consideration also to the more exacting tests of invention applied by the Supreme Court in its latest decisions, it is impossible for us to perceive that Rode exercised the inventive faculty or accomplished what was beyond the expected skill of the highly trained modern mechanic.

The generalization that it is not permissible to aggregate several old devices to invalidate a patent originally announced in Topliff v. Topliff, 145 U.S. 156, 12 S.Ct. 825, 36 L.Ed. 658, and not infrequently guiding us to decision, Williams Mfg. Co. v. United States Shoe Machinery Corp., 6 Cir., 121 F.2d 273, affirmed, 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537, is, of course, not applicable where the state of the art at the time of disclosure, is such as to make combination obvious. It has often been said in this court that "however meritorious may be the inventor's thought in terms of result, unless the means adopted in attaining such result are novel and denote invention, either separately or in. combination, he may not have a valid patent, for we are dealing with a machine and not a method." U. S. Gypsum Co. v. Consolidated Expanded Metal Co., 6 Cir., 130 F. 2d 888, 891; Reo Motor Car Co. v. Gear Grinding Machine Co., 6 Cir., 42 F.2d 965, 968. It has also been pointed out that the coupling of a motor that will run any kind of a machine, to a machine that will run with any kind of a motor, is not invention. Since most machines require translation of movement from the source of power to the operative mechanism by means of gearing, it must also follow that the coupling of an old motor to a conventional apparatus by means of a known or obvious expedient for translation of movement, is likewise not invention. Once it is understood that the wheels of a gear train may be arranged in any one of many combinations to multiply or reduce speed, with infinite variations in size and succession, it cannot be that every new arrangement of gears, not before precisely disclosed, merits the granting of another monopoly. Cf. Univis Corp. v. Rips, 6 Cir., 104 F.2d 749, 752.

We undertake no separate discussion of the argument that the Rode

patent deals with an exhausted combination, for that is but another way of saying that the patent fails to disclose an advance in the art beyond the expected skill of the mechanic. Nor in view of the conclusion reached is it necessary for us to consider the rule of Bassick Mfg. Co. v. R. M. Hollingshead, 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251, and Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U. S. 545, 58 S.Ct. 662, 82 L.Ed. 1008. We hold the claims in suit of the Rode patent, invalid.

### No. 9749

In this case there is involved the patent to Balcker, No. 1,503,105, issued July 29, 1924 upon application filed February 6, 1922, for a pressure pad. Only claims 7 and 13 are involved, and they were held valid and infringed. Whatever may have been the issues pressed below, the appellant, both in brief and argument, with commendable frankness pays tribute to the invention and to Balcker's meritorious contribution to the art of accurately shaping metal sheets by means of dies in a stamping press. Its defenses are admittedly technical, based not upon anticipation or lack of invention, but on what it says was failure or ineptitude of the draftsman to appropriately disclose and claim Balcker's invention.

The patent is for a fluid pressure pad for sheet metal presses of the type described in No. 9748. It had been the practice, in the designing of such presses, to use a resilient cushion or pressure pad to hold the lower die member. This is best described by Klocke in his patent No. 1,-404,911, 1922, wherein he says that it was customary to make the bottom of the die yieldable under the pressure of the punch against it in order to secure a sharp impression. Another function of the resilient cushion is that it acts as an ejector of the finished blank when the pressure of the ram is removed. In a double-acting press, with which we are here concerned, the ram actuates two movements, first, a work-holder descends and clamps the edges of the work, then the upper die descends below the level of the holder to make the draw, producing a cup shaped piece. In conventional presses, however, the work-holder is not released after the draw is made, until the upper die has been withdrawn to an extent at least level with it. So if immediate reaction of the cushion were permitted, the work piece would be ruined since its rim is still held immovable by the work-holder. To avoid this, mechanical locks had been devised to prevent the reaction of the cushion until the withdrawing ram had released the work-holder. These had not proved entirely satisfactory because of a tendency of the parts to spring back when pressure was removed. Balcker undertook to overcome this tendency by imparting to the cushion a slight additional downward movement after the completion of the draw.

The patent shows a pneumatic cushion, the lower die being supported by a cylinder, or cylinders, containing air under compression. On the down stroke of the ram a piston is forced downward against this air pressure, but when the ram starts upward a valve is opened permitting pressure to flow into the cylinder above the piston. With the upward pressure thus neutralized, the piston is caused by the weight of the parts to automatically drop a slight distance until the pressure pad seats against appropriate stops. The ram is then allowed to rise until the holder releases the work, after which the air above the piston is exhausted and the cushion, in response to the compression in the lower chamber, rises to eject the work and prepare the press for another stroke.

Claim 7 reads as follows: "A fluid pressure pad for sheet metal presses, said pad being operable as a blank holding means during a portion of the cycle of operation of the press, means operating automatically to cause the pad to move beyond the operative stroke of the press during a portion of the same cycle of operation of the press and after the forming operation, and means whereby the said movement may be varied at will."

The appellant contends that since the only distinction between this claim and claim 6, not in suit, resides in the words "and after the forming operation," the claim is purely functional, entirely devoid of structural substance, and a mere statement of a problem rather than of a solution, and so is invalid as failing to satisfy the requirements of § 4888 R.S., 35 U.S.C. A. § 33. It explains that if the pressure pad is used only as an ejector and the time of its release is designated only by the phrase "after the forming operation," the claim is indefinite for the drop could be made to occur after the plunger has passed dead center and the pressure bed has risen enough to injure the work. For a specific statement of the invention, the claim should

recite that the pad is caused to move beyond the operative stroke of the press after the forming operation and before the pressure on the pad, caused during the draw, is released. Furthermore, since Balcker sought to improve upon Klocke by effecting the further movement after the forming operation, and the means utilized was an outside source of power controlled by the press, he should have claimed his means specifically. Instead, he tried to secure a monopoly of the result without limiting it to the means invented for its accomplishment, and this he may not do. General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402; United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232; Heidbrink v. McKesson, 6 Cir., 290 F. 665.

It is understood that Balcker improved upon Klocke by effecting further movement of the pressure pad after the forming operation. This was to be done by the power stroke of the ram in overcoming fluid upward pressure. The crux of the invention and its precise point of novelty, resides in the further movement of the pad after the forming operation, and not in operative means undoubtedly well understood in the art. The claim therefore recites not only that there are to be means operating automatically to cause the pad to move beyond the operative stroke of the press after the forming operation, but also means whereby such movement may be varied at will. Such variation necessarily includes both the downward and upward movement of the pad after the forming operation. The claim is addressed to those skilled in the art, and it is impossible to construe it as disclosing a movement, in such timed relation to the release of the holder, as would defeat the clearly expressed purpose of the invention. We adhere, of course, to the rule that a limitation may not, by interpretation, be incorporated into a claim, but the scope of the second means clause is clearly to be gathered from the specification and drawings, and becomes a matter of interpretation rather than amendment. Nor are such means for movement variation mere statement of a problem requiring experimentation for its solution —rather is it such adjustment as undoubtedly is required with much apparatus. Routine adjustment leading to a clearly understood and expectable result, is not experimentation in pursuit of the solution of an unsolved problem. The need for adjustment of the means for the release of the pressure pad was undoubtedly sensed by the inventor, not only for the purpose of effecting the object of the invention in preventing the spoiling of the shaped material, but to give adjustability to the movement of the pad required by the depth of the draw.

■ Concluding that the essence of the invention was the further downward movement of the pad after the operative stroke of the ram, and that its reaction was to be controlled by fluid pressure, there was nothing that Balcker could teach the art as to means for controlling, releasing, or neutralizing such pressure. The mechanism for that purpose was merely incidental to the invention, and not at the precise point of novelty, within the doctrine of Davis Sewing Machine Co. v. New Departure Mfg. Co., 6 Cir., 217 F. 775, to which both parties pay tribute. Cf. Firestone Tire & Rubber Co. v. U. S. Rubber Co., 6 Cir., 79 F.2d 948. Claim 7 is not, we think, functional, and we hold it to be valid and infringed.

■ Claim 13 reads: "A pressure pad for sheet metal presses embodying a cylinder and piston movable one with relation to the other, means for exerting a resistance pressure upon one side of the piston, and means operating automatically to neutralize such pressure upon the piston at a predetermined time in the operation of the press."

The appellant argues that this claim does not differentiate from prior art locks, since "neutralize" means simply "counteract"— that is, to make inoperative, so that any lock which prevented the pressure from acting would answer the claim. On the other hand, if "neutralize" is read as "equalize," then there is no proof of infringement, since there is no proof that defendant's structure has equal pressure both above and below the piston, gravity excluded. However, what Balcker specifies is that the active upward pressure be neutralized so that the downward pressure, plus the weight of the parts, exceeds the upward pressure, and if this claim is to be read in the light of the specification, it is clear that Balcker teaches the introduction of an active downward force, not merely, as in the prior art, an inhibition on the action of the upward force. The advance over prior art would therefore seem to be clear. The accused structure is a hydraulic

lock operated by a compressed air piston. Compressed air, entering through an automatically controlled valve, operates the pneumatic piston so as to cut off the supply of oil above the hydraulic piston, and then forces more oil into this space, thus forcing piston and pressure pad below the point to which they are moved by the ram. When the pressure in the pneumatic cylinder is released, the hydraulic piston rises with the cushion and forces the oil back into the tank, meanwhile pushing the pneumatic piston back to starting position. Both master and court found that this mechanism performs the same function as that of Balcker, in substantially the same way, to achieve the same result. It adopts the teaching of the invention, imparting a slight additional downward movement to the pressure pad by putting fluid pressure on a piston. We agree.

More specifically, the appellant argues that the downward force exerted on its piston never attains equality with the upward force exerted on the cushion, for the cushion will drop as soon as the upward force is exceeded by the downward pull plus gravity, so that if "neutralize" in the claim is to be given its normal definition, claim 13 is met by the mechanical lock constructions of prior art disclaimed by Balcker, and if "neutralize" is to be given a special meaning requiring the exertion of a down force, exclusive of gravity, equal to the dynamic lifting force of the cushion, then there is a failure of proof of infringement, for the reason that the downward force on the appellant's piston can never exceed the cushion lifting force minus gravity, by more than enough to overcome friction. We are, however, dealing with a practical apparatus in a practical art, and are not in the realm of metaphysics. The purpose of the invention is to keep the pressure pad out of the way after it has performed its function in helping to give precision to the draw, and before reaction is permitted, so that it may function as an ejector. Control is achieved by appropriately varying fluid pressure above and below a piston in a cylinder. The appellant's accused device achieves this result, if not in the same way, certainly within the application of the doctrine of equivalency. An invention so meritorious and of such benefit to the art, as this frankly is conceded to be, is not to be struck down, nor is its infringement to be avoided by nice distinction between a force that equalizes, or one that neutralizes another force when the result, for all practical purposes, is the same. We hold claim 13 to be valid and infringed.

## No. 9750

Here is involved patent No. 1,773,438 to Rode, granted August 19, 1930, for a press for drawing sheet metal and the like. The defendant admitted infringement, but assailed the validity of the claims in suit, which are 3, 4, 9, 21, and 24. The master found them valid, the court affirmed, and an appropriate decree for injunction and accounting was entered, from which the defendant appeals.

Rode discloses a press of the general configuration and mode of operation already discussed, but with a built-in cushion bed. In presses employing fluid pressure for cushioning the lower die and controlling its reaction after the draw, it was understood that the pressure exerted upon the bed must remain relatively constant during the draw, and must not be built up to a high level by the compression of the piston. This requirement had been met by providing a separate surge tank connected with the cushion cylinder so that an increase in pressure, being distributed through a large volume of air, would be small enough to be negligible. Rode's construction does away with the separate surge tank and incorporates it into the bed of the press as an integral part of it. The advantages claimed as a result of this integration include more compact construction, the elimination of much outside piping, a reduction in the size of the pit required as a foundation for the press, and a consequent reduction in cost of construction.

Disregarding the several references in recorded prior art which are seemingly remote, including Lockett No. 837,086, and Oxnard No. 1,085,818, and not conceiving Hawkins No. 1,205,622 pertinent because Rode makes no claim that he originated the idea of preventing the building up of pressure by enlarging the air receptacle, we find the most pertinent art residing in the Strand patent No. 1,354,785, granted October 5, 1920. Strand's cushion is not integral with the bed of the press but is nevertheless incorporated in it, being designed as a separate unit which may be attached and detached from the press. It does, however, show a cushion without a separate surge tank although Strand provides a safety valve for the control of

pressure. Something of the sort is suggested by Rode, although his patent claims do not include it.

When the Rode application first came before the Patent Office the claims which were substantially identical with those now in suit, were rejected on the ground that it would not involve invention in making the casing or cylinder in Strand an integral part of the press. Rode sought reconsideration, pointed to the greater simplicity of his invention over Strand, the reduced number of its parts and attachments, and the saving of space in its installation. He explained that he had done more than make an integral structure from devices which theretofore had been assembled together, and asserted that this achievement was beyond the skill of the ordinary workman. Although it was not then suggested, nor is it now demonstrated that the Rode press, so integrated, would function otherwise than prior art structures or produce any new and useful result, the examiner reconsidered and all claims applied for were allowed, including those now in suit, of which claim 3 is sufficiently typical and is printed in the margin.[2]

The master conceded the difficulty of determining whether Rode did anything new and, if so, whether it was invention, concluding, however, that the integration of the cushioning device and press structure and the elimination of parts satisfied the test of invention with the reservation, however, that perhaps the result was the determining factor in the process of his arrival at such conclusion. The court in affirming, while perceiving that the invention disclosed fewer parts and entailed less cost than those of the prior art, saw no great difference in function and purpose, and did not regard the patent as exemplifying "profound invention." Such doubts as assailed it were resolved on the weight of the evidential presumption of validity and the master's finding.

If all that Rode did was to combine the surge tank with the press into a unitary apparatus, the claims in suit must yield to the rule that it is not invention either to make integral, parts that have formerly been distinct, or to separate two elements that formerly were integral. I Walker on Patents, 196, and cases there cited. The appellee, however, contends that integration was not the sole achievement of the Rode invention, and so we have given careful consideration to the patent, have searched the record, and considered the argument to determine, if possible, what Rode's contribution was in addition to the uniting of press and surge tank, or whether some problem was there involved, the solution of which called for the exercise of the inventive faculty. The appellee claims that Rode did more than merely cast two parts of the press as one; that in so doing he was required to balance the stresses so as to provide a bed which would act not only as a chamber for the cushion, but would remain strong enough to resist the enormous pressure of the ram. Nothing of this appears in the patent, no dimensions or formula for stress or strength are given, and it is not now demonstrated that their determination presented any problem outside the experience or beyond the ability of the practical engineer. Nor does it seem that the advantages of the unitary construction were all on the profit side. Rode was required to add metal for strength and pressure resistance, and it would seem to be clear that a press of unitary construction would present more difficulties in its repair when it failed, than would one wherein the bed was separable and could be removed for purposes of repair or replacement. It may, perhaps, be conceded, without the concession compelling recognition of invention, that advantages over-balanced disadvantages, since the appellee sold more than 100 of the unitary presses, but we are unable to perceive that such imbalance of advantage disclosed invention. The unifying of the structural elements of an apparatus to simplify it and to achieve an economy of working parts is, in most cases, but the routine accomplishment of the practical designer. So also is simplification which results in the saving of space. Nothing beyond that is here disclosed.

---

[2] "3. As a unitary structure, a press for drawing sheet metal and the like embodying a pressure pad, cushioning means for yieldingly resisting the movement of the pad in one direction, said cushion embodying a chamber formed as a part and parcel of the press, a piston reciprocable in the chamber, said pressure pad operating upon the said piston, and means for supplying a predetermined amount of fluid to the chamber to be compressed by the movement of the piston with respect to the chamber."

It seems reasonably clear that both master and court were led to their conclusions, though with some reluctance, by the presumption of validity inhering in the patent grant, a presumption not accorded great weight in the more recent decisions of the Supreme Court, notwithstanding its positive assertion in Philippine Sugar Estates Development Co. v. Government of Philippine Islands, 247 U.S. 385, 38 S.Ct. 513, 62 L.Ed. 1177, and Radio Corporation v. Radio Laboratories, 293 U.S. 1, 54 S.Ct. 752, 78 L.Ed. 1453. The stricter tests of invention applied by the Supreme Court in recent years, have been repeatedly noted by us and by other Courts. Cleveland Trust Co. v. Schriber-Schroth Co., 2 Cir., 108 F.2d 109; Buono v. Yankee Maid Dress Corp., 2 Cir., 77 F.2d 274; Witness, Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58. There is some justification, therefore, for the statement in Aero Spark Plug Co. v. B. G. Corporation, 2 Cir., 130 F.2d 290, 294, "The presumption arising from its issuance by the Patent Office is a faint one." We have had occasion to suggest, as in Williams Mfg. Co. v. United Shoe Machinery Corp., 121 F.2d 273, that perhaps in view of the growing recognition of finality, now generally accorded administrative determinations because they derive quality from the conclusions of experts with technological skill and great experience in the problems involved, there must now be accorded to a patent grant a greater presumption of validity than heretofore, and that the granting of a patent has, in some respects at least, the aspect of an adversary proceeding with the examiner charged with protecting the public from undeserved monopoly. This developing respect for administrative judgments has now reached its apotheosis in Dobson v. Commissioner of Internal Revenue, 320 U.S. 489, 498, 64 S. Ct. 239, 245, and certainly a patent yields nothing to a tax as posing a problem dealing "with a subject that is highly specialized and so complex as to be the despair of judges." So far as we have observed, however, our suggested analogy between Patent Office decisions and those of other administrative agencies, has elicited no response other than the observation in Aero Spark Plug Co. v. B. G. Corporation, supra, 130 F.2d page 294, note 5, to the effect that a Patent Office proceeding is not, in any true sense, adversary, because of its nature and the limited opportunity given to the public to be heard. We conclude that the claims in suit are invalid.

## No. 9751

Rode patent No. 1,834,111, here in suit, purports to advance the art beyond the teachings of Balcker disclosed in companion case No. 9749. Rode adopts Balcker's concept of a further drop of the pressure pad after ram pressure is removed, but while Balcker does this with a purely pneumatic cushion, Rode utilizes a combination of hydraulic and pneumatic means to accomplish the same result. Both master and court found the claims in suit, 8, 10, 11, 13, 14, 17, and 19, invalid for want of invention and lack of utility. It is the plaintiff, therefore, who in this case pursues the appeal.

As did Balcker, Rode shows fluid pressure controlled means for imparting a further movement to the pressure pad, but uses a liquid, such as oil, in place of air. One of the advantages claimed for liquid pressure control, is that there is no escape of air to interfere with the perfect functioning of the lock as it secures the pressure pad in dropped position until the retreating ram has released the work-holder. Balcker, however, disclosed the use of fluid pressure without specifying whether it be liquid or gaseous. It would seem, therefore, that there would be no invention in substituting one form of fluid pressure for another. It is undoubtedly true, from the evidence, that the use of the Balcker invention with a liquid controlled means, would require some adaptation of Balcker's commercial form, but this is clearly, upon this record, not beyond the skill of the art. In any event, hydraulic locks were old prior to Rode. This, and that good results had been obtained with such locks, Rode concedes. He said, however, that they permit a "kick back" or "back lash" due to air trapped in the oil, and the object of the invention is to overcome this by causing the pad to drop below the point where it was moved by the ram. This principle was, however, elucidated by Balcker, and we are not persuaded that there is clear error in the concurrent findings of master and court that no invention resides in the use of a hydraulic controlled means for the carrying out of the Balcker concept. This conclusion is fortified by the fact that when the Rode application was considered in the Patent Office, no pertinent prior art was

cited by the examiner, and so the presumption, in support of validity, becomes indeed, a faint one.

Upon the issue of utility the case may be close, but we nevertheless agree with the conclusions of the master as affirmed by the court. Two presses were built by appellants in 1931–2 for Amtorg, the Russion purchasing agency in the United States, for shipment to Russia. They were built according to Rode's conception, his patent not having yet issued. They did not work until substantial changes had been made in the principle of their operation according to the design of Peterson and Murchall, in 1932—a design which has been kept and followed in appellant's commercial presses, and in respect to which the appellee concedes there is no question of infringement.

■■■ The Amtorg presses, as originally built, were in close accord with the patent. Their inutility was the result of a short head of oil in the cushion member reservoir which permitted air to enter the locking chamber along with the oil, and since air is compressible, this destroyed the downward movement, rendering the cushion useless. The reservoir in the cushion chamber was then abandoned and an outside tank installed, the oil feeding only to the space below the piston, the valves of which were enlarged. As so altered the presses worked satisfactorily. Appellant contends that even as altered the Amtorg presses used the principle of the patent in forcing additional oil into the space above the locking piston to force it down and thus pull down the cushion piston. The essence of the invention, it says, is the adaptation of the Balcker idea to a hydro-pneumatic cushion, with a resultant saving in air, the location of the oil reservoir and direction of oil flow being merely incidental. It endeavored to demonstrate this by an exhibit, allegedly conforming to the patent, which successfully produced a 7/16-inch draw. The record, however, supports the finding that such draw is too small for commercial use, the hydro-pneumatic type being commonly used only for large and heavy work. The test of patentable utility is practical usefulness, and a machine is not useful if it merely accomplishes a purpose only to such a restricted extent as to make its use in industry prohibitive. Hartford-Empire Co. v. Obear-Nester Glass Co., 8 Cir., 71 F.2d 539, 544 certiorari denied 293 U.S. 625, 55 S.Ct. 345, 79 L.Ed. 712. While crude operativeness may be enough in the case of a generic patent, Hildreth v. Mastoras, 257 U.S. 27, 66, 42 S.Ct. 20, 66 L. Ed. 112, Sun Ray Gas Corp. v. Bellows-Claude Neon Co., 6 Cir., 49 F.2d 886, the patent in suit is clearly not generic, nor is there contention that it is.

Doubtless, Rode's structure as modified by Peterson and Murchall, has proven commercially useful, and so the appellant urges that it comes within the doctrine developed in this court in Computing Scale Co. v. Standard Computing Scale Co., 6 Cir., 195 F. 508. There it was concluded in the characteristic logic of the late Judge Denison in reliance upon Standard Cartridge Co. v. Peters' Cartridge Co., 6 Cir., 77 F. 630, that "a completed invention is not negatived because the drawings are rude or imperfect, or because they are incomprehensible to one unacquainted with that class of machinery, or because they do not in all respects show the relation of the novel features to the old device nor describe precisely the mode of attachment nor with scientific exactness show other details of the combination." [195 F. 511.] So he concludes that a patent disclosure may be valid provided the flaw can be corrected by the mere exercise of mechanical skill and not further invention. We have no occasion to challenge or depart from the doctrine so rationalized. It is not, however, applicable to the present case.

Rode was chief engineer for the plaintiff. He had had long experience in the manufacture of presses according to Balcker, saw some disadvantages of the Balcker arrangement, and undertook to eliminate them. The Amtorg presses constituted reduction to practice of his concept. The conclusion is inescapable that they were built at his direction, under his supervision, and according to his design, and that he was in very truth, deus ex machina. The presses failed. We are not here concerned with that constructive reduction to practice by the filing of the specification and drawings which the established rule makes the equivalent of the actual building of a machine, Computing Scale Co. v. Standard Computing Scale Co., supra, because here we have the actual, rather than the constructive, embodiment of the inventive concept, and the machines which failed must be considered as its ultimate materialization. Nevertheless they lacked utility in the practical sense.

Nor are we here concerned with the question posed in the Computing Scale Company case as to whether the modifications made by Peterson and Murchall were inventive, or were within the skill of the art. Rode was the inventor. By his application for a patent he proclaimed himself possessed of that "something more" which transcending routine mechanical skill entitled him to a patent. He may not, therefore, be heard to say that what others did to complete the reduction of his concept to practice, which he himself either could not or failed to do, was merely the exercise of mechanical skill. Rode's failure to embody his concept in a practical machine, may not be laid at the door of one unacquainted with that class of machinery, or one to whom the drawings and description were incomprehensible. So whether we say that Rode was not the inventor of the apparatus covered by the patent claims, or that his invention lacked utility, or that he is estopped from denying invention by those who gave utility to his concept, or that he failed to make the full disclosure required by R.S. § 4888, 35 U.S.C.A. § 33, the result is the same. We hold the claims in suit invalid

It follows from what we have said, that the decrees in 9749 and 9751 are affirmed; that the decrees in 9748 and 9750 are reversed and the causes remanded to the district court with instructions to dismiss the bills therein.