**BROWN & SHARPE MFG. CO. et al. v. KAR ENGINEERING CO., Inc.**

No. 4096.

Circuit Court of Appeals, First Circuit.

March 14, 1946.

Writ of Certiorari Denied June 10, 1946.

See 66 S.Ct. 1377.

Hector M. Holmes, of Boston, Mass. (Maxwell Fish and Fish, Richardson & Neave, all of Boston, Mass., of counsel), for appellants.

Thomas J. Byrne, of New York City (Allen C. Bakewell, of New York City, Clifford H. Byrnes, of Boston, Mass., and D. Clyde Jones, of Rochester, N. Y., of counsel), for appellee.

Before ALBERT LEE STEPHENS, MAHONEY, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

This is an appeal from a judgment dismissing a complaint in an action brought for the infringement of claims 1, 5, 7 and 14 of United States patent No. 2,053,177 applied for on December 6, 1934, by one Bower, a British subject, and issued to the plaintiff James Neill & Company (Sheffield) Limited, a British limited company, as his assignee on September 1, 1936. The other plaintiff, Brown & Sharpe Manufacturing Co., a Rhode Island corporation, is the holder of an exclusive license to make, vend and use the device covered by the above patent in the United States.

The Bower patent is for an "improvement in work holders;" specifically for what are called permanent magnetic "chucks."

Broadly speaking the term "chuck" embraces a wide variety of vice-like appliances for holding work in a machine such as a lathe, a milling machine, or a grinder. Magnetic chucks as their name implies are used to hold work by magnetic attraction (the work of course must be of magnetizable metal) which because of its small size or irregular shape cannot readily be held mechanically in some sort of clamping device. Ordinarily magnetic chucks are made in two types; one in the form of a cylinder or disk which is adapted for attachment as a face plate to the spindle of a lathe and is used to hold work for turning; the other in the form of a rectangular box which is adapted to hold work on its top surface for milling or for grinding under an abrasive wheel. For present purposes it will suffice to discuss and describe magnetic chucks of the latter type only.

Electro-magnetic chucks have been well known and widely used in industry for a great many years. In operation, however, they have always presented difficulties in that they have to depend upon direct, not alternating, electric current which is not usually available commercially and must therefore generally be produced by the inconvenient and expensive process of rectifying alternating current; that they have to be attached to a source of such current by an electric cord and so cannot be moved about freely and used at any place in a machine shop or factory; that electric current costs money; that if for any reason the flow of current to the magnets in the chuck is interrupted the chuck becomes inoperative; that if the current suddenly

ceases to flow to the magnets while the chuck is in use the work piece upon it, particularly if it is being ground, has a tendency to fly off and injure workmen, or damage the work piece or other property; that such chucks must be made and kept waterproof to prevent short-circuiting; and that electro-magnets generate heat which distorts the work piece by expansion thereby making it difficult to shape the piece with precision. However, until Bower, permanent magnetic chucks presented an even greater difficulty, and apparently it was an insuperable one, in that there was no way to remove work pieces from them except by forcing them off against the attraction of the magnets. Bower overcame this difficulty, and thus released industry from the necessity of putting up with the disadvantages of electro-magnetic chucks, by providing a permanent magnetic chuck in which the magnetism could be turned off and on by the movement of a lever almost as easily as an electric current can be turned off and on.

His contribution promptly met with substantial commercial success. The court below found on ample evidence that "What was evidently needed was a device [i.e., a permanent magnetic chuck] that was simple to operate and which would first hold firmly in place a work piece and then without moving the work piece release it so it could be removed without application of any effort or energy beyond that ordinarily required. Bower's device satisfied that need. This is demonstrated by the immediate commercial success of his device. Of course, the sales were augmented by the demand created for machine tools by the war. But, even if this inflated demand be discounted, the showing is impressive."

"When plaintiff embodied Bower's invention in a commercial chuck, it was an immediate success. The trade greeted it with astonishment and enthusiasm at its simplicity. From July, 1937 to July, 1944, 23,335 rectangular models of the chuck were sold; and from 1939 to July, 1944, over 20,000 rotary models were sold. The net sales were approximately $2,800,000."

Bower admittedly discovered nothing new about the nature of magnetism. His contribution resulted from taking advantage of its known effects and manner of operation. To understand what he did we must have recourse briefly to some of the elementary principles of magnetism all of which have been well known for years.

Only iron and certain of its alloys have magnetic properties. That is, only such metals can be magnetized and only such metals are attracted by a magnet. And different types of iron and alloys of iron exhibit different magnetic properties in that some when magnetized lose their magnetism almost instantaneously while others retain a substantial part of their magnetism almost indefinitely. Thus if a bar of soft iron is placed within a coil of wire carrying a direct current of electricity the bar will become magnetized, and when the current is turned off the bar will lose its magnetism at once. This is the familiar electro magnet. But when a bar of hard steel, particularly cobalt magnet steel or an alloy bearing the trade name Alnico is given the same treatment, it will retain a large part of its magnetism for a long time after it has been removed from the electrically energized coil. This is the equally familiar permanent magnet. Both permanent magnets and electro-magnets have similar qualities of attraction.

This quality results from the flow of magnetic force from one pole of a magnet to the other. At each extremity of the axis of every magnet there is a region called a pole where the magnetic force of the magnet concentrates. One pole always tends to point in the general direction of the north pole of the earth and is called the north, or positive, or plus pole of the magnet. The other is called the south, or negative, or minus pole. Lines of magnetic force, magnetic flux as it is sometimes called, emanate from one pole and forming closed continuous loops pass to the other pole and thence continue through the magnet itself. These lines of force always form a complete magnetic circuit and always seek the easiest path, that is, a path through magnetic material if such a path is available, rather than a path through the air or through some non-magnetic material. The area surrounding the poles of a magnet through which these lines of force pass is called the magnetic field.

Thus if a piece of magnetizable metal is placed in a magnetic field the lines of magnetic force in the field, instead of passing through the air where they meet more resistance, will pass through the metal where they meet less resistance and concentrate there. As a result the looping lines of force defining the magnetic field will be flattened, or less looping, at the

place within the field where the metal lies. In other words, lines of magnetic force loop out more widely when passing through resistance such as air or a non-magnetizable material than they do when passing through a material which can be magnetized. In consequence if the poles of a magnet, such as the familiar horseshoe magnet, are bridged by a piece of magnetic material, a keeper as it is called,[1] the magnetic flux passing through the bridge or keeper will cause it to adhere to the magnet. And, if the bridge be large enough to accommodate all, or substantially all, of the flux emanating from the magnet, a piece of magnetic material placed on top of the bridge will not appreciably be attracted to the magnet because only stray lines of magnetic force will reach it to exert any force thereon. Similarly if a piece of magnetizable metal is separated from the poles of a magnet either by an air gap or a piece of nonmagnetizable material by even so much as an eighth of an inch, only stray lines of magnetic force will reach the metal to exert any pull upon it.

Bower applied these familiar principles of magnetism in what appears to be a novel way. In the metal casing of his chuck, the box part, he, in patent jargon "slidably," arranged two rows of W-shaped permanent magnets, each row consisting of four magnets in tandem. Each of these magnets was made with a central pole of one polarity and end poles of the opposite polarity, and they were arranged so that their poles, all of which pointed upward, alternated. He connected the magnets in each row to one another by links, and he connected the magnets on one end of each row by links to eccentric pins on a shaft extending transversely across that end of the casing. Thus by rotating a lever attached to one end of the transverse shaft outside the casing he could simultaneously move all the magnets a short distance longitudinally in the casing. Then he put the cover on the casing which formed the work holding surface of his chuck. This consisted of a plate of non-magnetizable metal into and extending through which were cast a series of inserts or plugs of "high permeability magnetic material" that is, of a metal like soft iron through which magnetic flux passes readily. He designed this cover so that when the magnets were moved by the lever on the transverse shaft, as has been described, to the "on" position each pole of each magnet registered directly under a separate insert. Thus, in this position each separate insert formed a pole piece, in effect an extension, of the pole of each magnet and in consequence the flux emanating from the poles of the magnets passed up through the pole pieces to the surface of the cover. So when a work piece of magnetizable material was placed on the chuck it was held firmly in place by the attraction of the magnets. But when the lever was moved to "off" position and the magnets shifted accordingly, the inserts or pole pieces, instead of forming extensions of the poles of the magnets, formed bridges or keepers between adjacent magnetic poles, and in consequence the flux was shunted, or in effect short-circuited, through the inserts and out of the work piece on the cover. Thus the work piece could easily be removed.

Viewed in retrospect it might seem to the uninitiated that Bower did no more than might be expected of any person familiar with the elementary principles of magnetism and aware of the shortcomings of electro magnetic chucks and the advantages of permanent magnetic ones if the latter could be made to release work without forcing it out of their range of attraction. But it is established beyond question that a patentee's achievement is not to be so viewed, and the court below was very careful to avoid doing so. It said [59 F.Supp. 820, 825]:

"Looking back on Bower's accomplishment, we may consider it as an obvious application to chucks of principles and techniques familiar to skilled craftsmen. On the other hand, this hindsight disregards the history of chucks. For years tool makers were producing chucks and inventors were offering applications to the Patent Office for improvements of chucks. Nonetheless until Bower they never coordinated their knowledge of existing chucks with their knowledge of means for diverting magnetic flux so as to produce a chuck of a permanent magnet type from which work could be released while in the normal work holding zone. Once this combination was offered it was granted a patent both abroad * * * and by the United States Patent Office, and had an instantaneous success."

---

[1] Such pieces are called "keepers' because when in place on a permanent magnet they prevent loss of magnetism.

Then the District Judge continued:

"If it were not for Cuno Engineering Corporation v. Automatic Devices Corporation, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58, and the line of authority which it has engendered, see, for example, Anderson Co. v. Lion Products Co., 1 Cir., 127 F.2d 454, I should, on the basis of the considerations set forth in the preceding paragraph, have concluded that Bower had made a patentable invention. But I cannot see how such a conclusion can stand in the light of the changed standards prevailing since the recomposition of the Supreme Court of the United States. * * * In the case at bar the prior art disclosed a chuck of the permanent magnetic type from which an operator would have to remove a work piece by force. Bower rearranged the chuck to offer an all metallic auxiliary circuit so that the operator could remove a work piece without force. The use of an all metallic auxiliary circuit, since it is familiar in other connections, must be held to be the mere bringing of an old device into a new combination.

"Tested by the rules enunciated by Mr. Justice Douglas in Cuno's case, I conclude that claims 1, 5, 7 and 14 of the Bower patent are invalid."

The foregoing squarely presents us with the question whether the Supreme Court in the Cuno case intended to establish for the future a new and higher standard of invention than had prevailed in the past?

This question has many times been given careful consideration by the circuit courts of appeals. Some seem to have regarded the Cuno case as the culmination of "a pronounced new doctrinal trend" of the Supreme Court of "a decade or more" standing which it was their "duty, cautiously to be sure, to follow not to resist." Picard v. United Aircraft Corp., 2 Cir., 1942, 128 F.2d 632, 636. Others have taken the view that in the Cuno case the Supreme Court did not intend to raise the "standard of originality necessary for a patent" but only intended to restate the traditional test for invention. In re Shortell, 1944, 142 F.2d 292, 295, 296, 31 C.C.P.A.Patents, 1062. For considered discussion of the question see United States Gypsum Co. v. Consolidated, etc., Co., 6 Cir., 1942, 130 F.2d 888, 892; Chicago Steel Foundry Co. v. Burnside Steel Foundry Co. 7 Cir., 1943,

132 F.2d 812, 817, 818; Trabon Engineering Corp. v. Dirkes, 6 Cir., 1943, 136 F.2d 24, 27; Cleveland Punch & Shear Works v. E. W. Bliss Co., 6 Cir., 1944, 145 F.2d 991. In Anderson Co. v. Lion Products Co., 1 Cir., 1942, 127 F.2d 454, 457, and Bellavance v. Frank Morrow Co., 1 Cir., 1944, 140 F.2d 419, 423, although not necessary to our decisions, we indicated that we inclined to the view that the Cuno case set a higher standard for invention. Now, however, we think that view mistaken.

In the first place there is internal evidence that the now famous language of the Cuno case[2] [314 U.S. 84, 62 S.Ct. 41] was not intended to be construed literally or applied generally. Standing alone that language indicates that a "flash of creative genius" on the part of the patentee is the sine qua non of invention. Clearly this sets a higher standard for invention than had ever prevailed before. But it is always dangerous to read words apart from their context, and, furthermore, the initial words of the sentence in which the above quoted phrase appears are "That is to say", and preceding this in the same paragraph is a statement of the traditional test supported by the citation of many old cases.

Then in addition an analysis of the Mead device under consideration in the Cuno case indicates that it was of such a nature that resort to a new, stricter or higher standard of invention was not necessary to support the Supreme Court's conclusion of invalidity. Possibly Mead produced a handy accessory for automobiles, but we cannot believe that it was the sort of thing the art was anxiously awaiting—the sort of thing that would have attracted serious study over a period of years by highly skilled automotive engineers. His device may have been a step forward, but certainly it was not a revolutionary or even a very important one. And it was only a combination of two well known devices of the prior art, an electric cigarette lighter of the removable wireless glow member type and a conventional bimetallic thermostat. Since it does not appear that any uncommon capacity was required either to conceive of the combination of these elements into an automatic lighter or, as a matter of mechanics, in making the combination, it would not seem that recourse to the test of a "flash of creative genius" was required to support the Supreme Court's conclusion

---

2 "That is to say the new device, however useful it may be, must reveal the flash of creative genius not merely the skill of the calling."

of invalidity for lack of invention. In fact it appears that the Supreme Court did not rest its conclusion upon any such test because it summarized its views by the statement (314 U.S. at page 88, 62 S.Ct. at page 39, 86 L.Ed. 58): "For it is our opinion that the Mead device was not the result of invention but a 'mere exercise of the skill of the calling,' an advance 'plainly indicated by the prior art.' Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 486, 55 S.Ct. 455, 458, 79 L.Ed. 1005."

In the second place later decisions of the Supreme Court indicate, we think unmistakably, that all that was intended in the Cuno case was a restatement of the classic test.

It will serve no useful purpose to analyze and discuss these decisions separately. It will suffice to say that we think it highly significant that although the Cuno case is sometimes cited in them its famous phrase is never quoted,[3] and that a paragraph in Sinclair & Carroll Co., Inc., v. Interchemical Corp., 325 U.S. 327, 330, 331, 65 S.Ct. 1143, decided after the judgment below was entered, definitely establishes that the traditional test is still applicable. In this paragraph, citing cases beginning with Hicks v. Kelsey, 1873, 18 Wall. 670, 21 L.Ed. 852, and ending with the Cuno case (1941) the Supreme Court said (the italics are ours):

"A long line of cases has held it to be an essential requirement for the validity of a patent that the subject-matter display 'invention', 'more ingenuity * * * than the work of a mechanic skilled in the art.' * * * This test is often difficult to apply; but its purpose is clear. Under this test, some substantial innovation is necessary, an innovation for which society is truly indebted to the efforts of the patentee. Whether or not those efforts are of a special kind does not concern us. The primary purpose of our patent system is not reward of the individual but the advancement of the arts and sciences. Its inducement is directed to disclosure of advances in knowledge which will be beneficial to society; it is not a certificate of merit, but an incentive to disclosure. * * * Consequently it is not concerned with the quality of the inventor's mind, but with the quality of his product." [325 U.S. 327, 330, 331, 65 S.Ct. 1145].

This quotation we think establishes conclusively that the Supreme Court has wrought no change in the classic test for invention—that there is no need to find a "flash of creative genius" on the part of a patentee in order to sustain his patent—and from this it follows that the court below erred in using the Cuno case to temper its tentative conclusion "that Bower had made a patentable invention." This does not mean, however, that we are overlooking the fact that during the past two decades or so the Supreme Court has applied its test in such a way as to strike down patents which on the basis of the older cases would seem to be valid. To us this indicates no change in doctrine but instead points to recognition of the fact that the classic test for invention, like the classic test for due care to which it is closely analogous, must, like any standard for human conduct, be applied in the environment of today, not yesterday, and that today, due to the tremendous advance in technicological knowledge and the wide dissemination of education, the general level of the capacity of those skilled in the various arts is far higher than it used to be. That is to say, it seems to us that recent decisions of the Supreme Court only indicate that more must now be done to qualify for the title of "inventor" than formerly was required. Nevertheless, applying the old test in the present-day environment we think the tentative conclusion of patentable invention made below must stand.

The direct prior art was concerned almost entirely with electro-magnetic chucks. We have considered it but pass it over without detailed comment because we are satisfied, as was the court below, that

---

[3] The only references to it we have found are in the dissenting opinions of Mr. Justice Frankfurter and of Mr. Justice Rutledge in Marconi Wireless Tel. Co. v. United States, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731, and both of these are indirect. Mr. Justice Frankfurter (320 U.S. at page 63, 63 S.Ct. at page 1422) referring to Marconi's predecessors in his art as, he supposed, "men of genius," said: "The fact is that they did not have the 'flash' (a current term in patent opinions happily not used in this decision) that begot the idea in Marconi * * * " and Mr. Justice Rutledge 320 U.S. at page 65, 63 S.Ct. at page 1423) characterizing Marconi's predecessors as "old hands and great ones", said that for Marconi "At such an altitude, to work at all with success is to qualify for genius, if that is important."

nothing in it would suggest the solution of the problem to which Bower addressed himself to anyone skilled in the art. There is one patent in another art, however, upon which the defendant heavily relies, which has more pertinence. This is a British patent to Edwards (No. 229,772) for an engineer's or architect's drafting board and T square.

Edwards discloses a conventional drafting board, except that it is provided with a strip of magnetizable metal along the left hand edge, and a T square with permanent magnets so arranged in the crosshead that when the square is placed on the board in position for use its head will adhere to the metal strip without slipping. Then, to provide means for readily moving the T square he shows a bar of magnetizable metal pivoted on the pole of one of the magnets in the T square head in such a way that it may be swung into and out of contact with the poles of the other magnets therein. Thus when this member is swung out of contact the T square will adhere to the strip on the edge of the drafting board, but when it is swung into contact with the other magnetic poles it will divert some of their flux out of the metal strip, in effect partially short circuit them, so that as a result they will have less attraction for the strip.

Edwards was concerned with comparatively weak magnetic forces in an art far removed from chucks, and his method of releasing an object from the attraction of a permanent magnet obviously differs materially from that of Bower. Under these circumstances, and in view of the fact that for all that appears Edwards' was only a paper patent whereas Bower's definitely was not, we agree with the court below that Bower shows invention over Edwards.

From the findings, which have ample support in the evidence, we must conclude that society is truly indebted to Bower for a substantial innovation in the machine tool art, an art not only crowded but also one in which skills are well known to be high. That he satisfied a felt need is manifested by the immediate and substantial commercial success of his device, which although advertised and in artificially increased demand because of the war, was found in spite of these factors to be "impressive." From this we conclude that on the findings made below the claims of the Bower patent here in issue are valid.

This brings us to the question of infringement.

The district court, in view of its ultimate conclusion of invalidity, made no findings on this issue. Nevertheless we are urged by the appellant to hold the claims in issue infringed because upon the evidence in the record and upon the subsidiary findings made below no other conclusion can reasonably be reached. We agree.

The chuck made by the defendant which is alleged to infringe looks very much like the plaintiffs'. Without going into unnecessary and confusing detail it can safely be said to have the same arrangement of permanent magnets, a similar lever by which they can be moved a short distance longitudinally in the casing from "off" to "on" position, and a cover or work-holding surface of non-magnetizable metal into and extending through which are cast plugs or inserts of magnetizable metal so arranged that in "on" position the permanent magnets register directly under them but in "off" position do not. But the defendant's structure differs from the plaintiffs' in this. The bottoms of the inserts in its face plate and the tops of its magnets are tapered so that, in "off" position, the inserts do not form all metallic bridges between adjacent poles of the magnets but instead are separated from the poles of the magnets by air gaps.

No reason is suggested for the adoption of this form of construction, it does not appear to produce a more efficient chuck but on the contrary the physical exhibits indicate a somewhat less efficient one, and the tapering of the parts and the necessity for their accurate alignment make the defendant's chuck more expensive and difficult than the plaintiffs' to manufacture. This provides substance for the plaintiffs' contention that the defendant adopted its construction only for the purpose of escaping the present charge of infringement. Furthermore the plaintiff and the defendant really do the same thing in that both move their magnets so that in "off" position the work piece is out of the range of their attraction and both accomplish this by sliding the magnets so that the inserts in the face plate cease to be extensions of the magnetic poles and thus conductors of magnetic flux through the face plate to the work piece. But to conform to the arguments we prefer to base our conclusion of infringement upon a somewhat different analysis of the chucks and of their

methods of operation, and the wording of the claims in issue. .

The defendant argues that its chuck operates on an entirely different principle from Bower's. It says that while Bower shunts the flux from his magnets out of the work by establishing an easier path for it through the inserts or pole pieces in the face plate as bridges, it, on the other hand, effectively blocks off the flux from the work piece by establishing air gaps, which it says are the best known insulators of magnetic flux, between the magnets and the inserts. In other words, it says that Bower provides a mechanism for shunting the magnetic flux out of the work piece whereas it provides a mechanism for barring the flux from the work piece. We think the answer to this argument lies in the effect, or lack of effect, of an air gap on a magnetic circuit and the scope of the claims in suit.

An air gap in a magnetic circuit does not interrupt the flow of magnetic force as an air gap in an electric circuit interrupts the flow of electric force. Magnetic circuits unlike electric ones are always closed and cannot be broken. As the court below found "magnetic lines always form a complete magnetic circuit." To be sure, these lines if passing through magnetizable metal will not loop out as widely as they do when passing through the air or through some non-magnetizable material, but this is not important here. What is important is that no matter what such lines of force pass through they will inevitably pass from pole to pole of a magnet through the easiest path available without diminution in volume, except as the magnet grows weaker, and they cannot be blocked off.

From this as we see it both the plaintiffs' and the defendant's chucks operate basically upon the same principle.

In "on" position with work in place the flux from the magnets in both the plaintiffs' and the defendant's chucks passes up through an insert to the surface of the chuck, thence through the work and down through an adjacent insert to a magnet of opposite polarity because that is the easiest part for it. But when the magnets are moved to "off" position the inserts in the face plate no longer serve as extensions of the poles of the magnets and so the path through them and the work is no longer the easiest one for the flux to take. In the plaintiffs' chuck the easiest path is then through the inserts as complete all metallic bridges; in the defendant's chuck this easiest path is partially through air and partially through the inserts as incomplete metallic bridges. In both chucks, then, there is a "shunting" of the flux, to use the terminology of the patent, through an "auxiliary" circuit, the only difference between the chucks being in the nature of this circuit. From this, as we see it, infringement necessarily follows unless the claims in suit are limited to a complete all metallic bridge as a shunt. We do not believe that they are.

Certain of the claims of the Bower patent are specifically limited to a circuit in "off" position in which there is a substantial bridging of adjacent poles of opposite polarity. But these are not the claims here in issue. Claims 1, 5, 7, and 14, which are in issue, claim means "to shunt said flux out of said work" or means "for establishing" or to "establish" "an auxiliary circuit" "to shunt" or "for shunting" the "magnetic flux" or the magnetic "field" "out of" or "from" "the work while the work remains in the normal work holding zone to release the work from the chuck." This language as we read it covers an auxiliary magnetic circuit to divert magnetic flux from the work piece and since such a circuit may be through metal, magnetizable or otherwise, or through the air but, as we have seen, must be through something, we conclude that the claims in issue read on the defendant's device. Certainly to construe the claims in issue otherwise would be to construe them narrowly, that is, as covering only a narrow range of equivalents, but they are entitled to more generous treatment than this because of the practical value and importance of the patentee's contribution.

The defendant's argument that the patent in suit is invalid because the patentee did not "particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention" (35 U.S.C.A. § 33) and its file wrapper estoppel argument have been considered, but both are found too insubstantial to warrant discussion.

The judgment of the District Court is reversed and the case is remanded to that court for further proceedings not inconsistent with this opinion; with costs in both courts to the appellants.