### FLORENCE–MAYO NUWAY CO. v. HARDY et al.

No. 5695.

Circuit Court of Appeals, Fourth Circuit.

May 4, 1948.

J. Hanson Boyden of Washington, D. C. (Lamb & Lamb and Luke Lamb, all of Wilson, N. C., and Stone, Boyden & Mack of Washington, D. C., on the brief), for appellant.

John J. Darby, of Washington, D. C. (K. A. Pittman, of Snow Hill, N. C., William A. Lucas, of Wilson, N.C., William M. Cushman, John W. Malley and Cushman, Darby & Cushman, all of Washington, D. C., and Lucas & Rand, of Wilson, N. C., on the brief), for appellees.

Before PARKER, SOPER and DOBIE. Circuit Judges.

PARKER, Circuit Judge.

This is an appeal by plaintiff in a patent infringement suit. Plaintiff is the owner of re-issue patent No. 22,221, covering an air conditioned tobacco curing barn, issued to one Reuben E. Mayo who was the holder of original patent No. 2,090,633 dealing with the same subject matter. Defendant C. L. Hardy is alleged to infringe the re-issue patent by the operation of tobacco curing barns embodying the Mayo invention; and he and the other defendants are alleged to be guilty of contributory infringement in the manufacture and sale of tobacco curing equipment embodying the substance of the Mayo invention and sold for use in tobacco curing barns in such way as to complete a combination constituting an infringement. Defendants deny that the re-issue patent involves patentable invention over the prior art and say, in addition, that it is invalid because not embodying the same invention as the original patent, because of laches in making application for the re-issue and because its claims are said to be no more than claims that were abandoned in the course of the application for the original patent. They deny infringement, also, contending that

their device differs from that of plaintiff's patent, which they say should be strictly construed and limited, and that the doctrine of contributory infringement cannot be predicated of their manufacture and sale of tobacco curing equipment. The District Judge held with defendants on these contentions and dismissed the suit.

### Invention and Prior Art

For many years it has been customary to cure tobacco by hanging it in barns and then heating the barns. Until recent years the heating was accomplished by means of wood or coal fires in a chamber from which flues carried the hot gases of the fire to a chimney in the opposite end of the barn. The air within the barn was heated by the flues, and the heated air, rising through the tobacco, dried and cured it. Air was admitted through the walls of the barn near the floor, and, after being heated and passed through the tobacco, was allowed to escape through a ventilator in the roof. In the 1930s, as wood became scarce in the tobacco growing section of the Carolinas and Virginia, attempts were made to heat tobacco barns by the use of oil as a fuel; and the Mayo patent was directed to the use of oil for this purpose in the conventional type of tobacco barns. It unquestionably solved the problems presented in a way so satisfactory that it entered into immediate use and the manufacture of the heating devices of the patent enjoyed wide commercial success. Fifteen thousand of these devices were sold within the course of a few years for around a million and a half dollars.

The patent in suit is for a combination of the typical ventilated top tobacco barn, old in the art, with a heating device consisting of open flame oil burners covered by a hood, and with a pipe to deliver fresh air from outside the barn under the hood and over the open flame burners, so that it will be heated and mingle with the products of combustion before escaping from beneath the hood to rise through the tobacco hanging in the barn. There is evidence that strongly supports the view that, by the use of this device, tobacco was cured in less time and more satisfactorily than by other methods, so that it weighed more and brought a better price on the market.

Whether this view was justified or not, the defendants apparently thought so; for their infringing device adopted the heart of the Mayo invention, viz., the intake pipe delivering outside air under the hood over open flame burners, and their advertisements proclaimed that tobacco cured in this way would be of better grade and would bring a better price on the market. Theories of experts pro and con were given in evidence; but more convincing than their evidence is the fact that the Mayo invention met the pragmatic test. Practical raisers and curers of tobacco began using it to such an extent that the old devices ceased to be sold. Even if this be explained in part by changes in fuel supply and trade conditions, the fact remains that Mayo had furnished a practical solution to the problems which these changes presented.

Claim 2 of the re-issue patent is the claim upon which plaintiff practicularly relies; and it may be taken as accurately describing the Mayo invention. It is as follows: "2. An air conditioned tobacco curing barn including vertically disposed side walls and a roof, at least one of said side walls having a doorway therein, said barn having a ventilating opening at its roof, tobacco racks within the barn, and air conditioning units within the barn, each comprising a casing, heating means of the open flame type within the casing, a hood overlying the casing and vertically spaced therefrom, means for supporting the hood in said relation, and an air intake pipe opening into the space above the heating means and extending through a side wall of the barn to receive fresh air, whereby fresh air from the outside will be mixed in said hood with the heated gases from the burner and will thereby be conditioned before passing upwardly into the barn."

There is nothing in the prior art which anticipates this combination. The tobacco barn, the arrangement of tobacco and the ventilator in the roof were old. Likewise old were the admission of air from the outside, the use of open flame burners for heating purposes and the provision of a hood over the burners. What was new was the combination of these with a device for

delivering the outside air under the hood and over the burners. It was this that accomplished the desired result; and such a combination was nowhere shown in the prior art. As in most infringement cases of this sort, many of the things which the patentee has brought together can be found separately in the art; but nowhere are they found in the combination which brought success to the patentee.

The prior art patent particularly relied on by defendants is the Buensod Patent No. 1,339,373, the purpose of which was to provide in tobacco barns a temperature at all times under control. This patent disclosed the use of closed heated flues surrounded by baffle plates to direct the course of air which had been admitted from the exterior through vents in the wall; but this disclosure is a far cry from the piping of air from the exterior and discharging it over open flame burners. It does not cover nor even suggest the heating device of Mayo. Another patent strongly relied on is Brock Patent No. 1,368,018, which discloses as the heating means of tobacco barns, long perforated bunsen burner type heaters covered by an adjustable hood. It has no provision, however, for the delivery of air from the exterior over the burners or under the hood or even for bringing air from the exterior at all. The Reynolds Patent No. 1,509,902 shows the use of an open flame burner under a hood, but no bringing in of air over the burner or under the hood. Smith Patent No. 2,051,348 shows the use of open flame burners covered by hoods or baffle plates, but there is no bringing in of air under the hoods or baffle plates and above the burners. The air inlets, to the contrary, discharge the air upwardly above the level of the hoods or baffle plates. A number of other patents are cited, but they are too remote to justify discussion. Nothing in any of the patents cited, or in all of them taken together, remotely suggests what we regard as the essence of Mayo's invention. The two chiefly relied on, Buensod and Brock, were cited by the Patent Office in rejecting certain claims on the application for the original patent, and were presumptively before the Patent Office when the re-issue patent here involved was being considered. It is worth noting that, while the Patent Office denied the re-issue (a judgment reversed by the Court of Customs and Patent Appeals In re Mayo, 129 F.2d 700, 29 C.C.P.A., Patents, 1192), this was done on the ground that the claims of the re-issue covered a different invention from that covered by the original patent and there was no suggestion that the claims ultimately allowed were invalid on the prior art.

The combination of Mayo, then, was new and useful and not anticipated in the prior art. We think it unquestionably involved patentable invention and not the application of mere mechanical skill. It is easy to say now that what Mayo did was simple and obvious; but nobody seems to have thought of doing what he did until he did it. Knowledge after the event is always easy, and problems once solved appear as never having presented difficulty. We must try, however, to avoid the danger which Judge Evans has recently pointed out of thinking there is no invention merely because we can understand a mechanism after it has been explained to us. National Slug Rejectors v. A. B. T. Mfg. Co., 7 Cir., 164 F.2d 333, 336. As said by Mr. Justice McKenna in the Grant Tire Case, "the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration." Diamond Rubber Co. v. Consolidated Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527; U. S. Industrial Chemical Co. et al. v. Theroz Co., 4 Cir., 25 F.2d 387; Frick Co. v. Lindsay, 4 Cir., 27 F.2d 59. Applicable also is the following statement from the opinion in Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910, 914, where we said: "To the presumption of validity attaching to the grant of the patent by the Patent Office, there is the additional presumption arising from the fact that the invention filled a want arising from a new situation, that it entered into immediate use, and that it met with pronounced commercial success. Tenco Electric Motor Co. v. Apco Mfg. Co., 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298; Diamond Rubber Co. v. Consolidated Rub-

ber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527; Pangborn Corporation v. W. W. Sly Mfg. Co., 4 Cir., 284 F. 217. And in addition to this is the presumption arising from the imitation of the patented article by the manufacturer of the alleged infringing device. As to this, we agree with what was said by Judge Hough, speaking for the Circuit Court of Appeals of the Second Circuit in Kurtz v. Belle Hat Lining Co., 280 F. 277, 281: 'The imitation of a thing patented by a defendant, who denies invention, has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think.' "

See also Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 54 S. Ct. 593, 88 L.Ed. 721, and Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912; Brown & Sharpe Mfg. Co. v. Kar Engineering Co. Inc., 1 Cir., 154 F.2d 48.

### Validity of the Re-issue Patent

■ It is argued that the re-issue patent is for a different invention from that covered by the original patent and hence invalid, the contention being that the claim of the original patent covered a tobacco curing barn without reference to the device for bringing air from the outside over the open flame burners and under the hood, which is the heart of the combination covered by the re-issue patent. The answer is that while the claims of the original patent broadly covered a tobacco curing barn and did not specifically mention the matter which made the combination patentable, this was fully covered by the specification. The question here under discussion was raised in the Patent Office and was decided against the patentee both by the Examiner and the Board of Review. Their decision was reversed, however, by the Court of Customs and Patent Appeals, In re Mayo, 129 F.2d 700, 702, 29 C.C.P.A., Patents, 1192, and we need add nothing on this point to the opinion of that court, wherein it is said:

"As hereinbefore stated, appellant's patent, as well as his involved reissue application, discloses an air-conditioned barn for the curing of tobacco. Appellant's invention, as therein defined, includes, in combination, a particular type of building, tobacco supporting racks within the building, and air-conditioning means for the proper curing of the tobacco, which air-conditioning means includes, among other things, a heater of the open flame type.

\*     \*     \*     \*     \*     \*

"We have given careful consideration to appellant's patent for the purpose of determining whether or not it was the intention of appellant to claim therein the specific air-conditioning units which he there described and which are essential elements of the combination there disclosed, and are of opinion that it was his intention to claim such air-conditioning units (each of the units including a heating element) in combination with the other elements of his air-conditioned tobacco barn, as defined in appealed claims 9 to 13, inclusive, and that through inadvertence, accident, or mistake, he failed to do so."

■ It is next argued that the re-issue patent should be held void for laches on the part of the patentee in seeking the re-issue. This point was not raised or suggested in the Patent Office or before the Court of Customs and Patent Appeals; and we think it entirely without merit. The lapse of time becomes important where an attempt is made to broaden the claims, in which case a presumption of abondonment of the new matter to the public arises after the lapse of two years. Topliff v. Topliff, 145 U.S. 156, 12 S.Ct. 825, 36 L.Ed 658; Miller v. Brass Co., 104 U.S. 350, 26 L.Ed. 783; In re Seabury, 108 F.2d 232, 27 C.C.P.A., Patents, 777. Here, however, the claim of the re-issue patent was not broadened but narrowed over that of the original patent, which covered a tobacco barn without limitation to the air conditioning means except as resort might be had to the specification; and the application for re-issue was made within two years. Moreover, laches in applying for the re-issue was not pleaded and we do not think it is shown by the evidence. Mayo was a layman, not a patent expert, and he had been issued a patent which described his invention in the specification although not in the claims. The mere fact that he was told by another

layman that the latter doubted the validity of the patent, did not impose upon him the inexorable duty of immediately making application for re-issue upon pain of forfeiting all right to his invention for failure to do so. If defendants had suffered prejudice or injury as a result of the application for re-issue not being sooner applied for, they would be in a better position to plead laches; but nothing of the sort was shown. Whether equity will bar a party of relief to which he is otherwise entitled on the ground of laches, depends upon the facts of each particular case; and to constitute the defense, the lapse of time must be so great and the relations of the defendant to the right claimed must be such that it would be inequitable to allow the plaintiff to assert it. Laches is not mere delay, but delay which works to the disadvantage of another. Hartford Empire Co. v. Swindell Bros. Inc., 4 Cir., 96 F.2d 227, 233. At the beginning of the trial in the court below, counsel for defendants disclaimed in open court any contention that plaintiff Mayo was guilty of laches. He changed this position, apparently because one of plaintiff's witnesses testified that he told Mayo sometime in 1938 that he thought the patent invalid. To claim laches on this slender basis is manifestly a mere grasping at straws.

■ Another defense, equally technical and we think equally groundless, is that the claims of the re-issue patent relied on here are void because similar claims had been abandoned in the application for the original patent. If this position were well taken, it would be strange that no such ground occurred to the officials of the Patent Office. With the file wrapper of the original patent before them showing rejection and abandonment of claims, however these officials denied the claims relied on here on the ground that they described a different invention, without once suggesting that they had been abandoned on the prior application. As a matter of fact, the claims that were abandoned were different in a number of particulars from the claims allowed on the re-issue. Claim 4 which is particularly relied on by defendants may be taken as typical. It is as follows: "4. A tobacco curing building comprising a building struc- ture, means for supporting tobacco in said structure, a floor formed in said building structure and defining an aisle therein, a plurality of liquid fuel burners mounted on said floor about the aisle, a hood for each burner and adjustable relative thereto, and manually controlled air intake means connected to each hood and receiving air from the exterior of the building structure, means for supplying fuel to said burners, and means for exhausting air from the upper portion of the building structure."

The file wrapper shows that this claim, along with claims 5 and 6, was rejected by the Patent Office as being a mere aggregation of devices shown in prior patents. The Examiner gave his reasons for the rejection as follows: "Claims 4, 5 and 6 are rejected as lacking invention over Brock in view of Buensod, Johnson, and Skaggs. Brock shows the equivalent of a plurality of burners at 11, a hood 18 over the burners, and adjustable relative thereto. Buensod shows an aisle between hot air supplying means at 15 and adjustable air intake at 11 and manually controlled ventilator arranged in the upper portion of the building structure. Johnson admits air from the exterior of a chamber by way of the inlet c5 to the hood F; Skaggs shows a float-controlled liquid fuel supply means. It would be an obvious expedient to use a plurality of burners like those of Brock on each side of an aisle, to employ an adjustable hood for each burner, manually adjustable air intake means for each burner, a float-controlled fuel supply and a plurality of manually controlled ventilators."

■ There are a number of surface differences between this claim and claim 2 of the re-issue heretofore quoted, which, we think, are sufficient of themselves to prevent a forfeiture of the patentee's rights. They are apparent upon a comparison of the language of the two claims. The fundamental difference, however, is that re-issue claim 2 shows the relationship between the elements of the combination, and points out, as the abandoned claim did not do, what is the heart of the invention claimed, in the following language: "Air conditioning units within the barn, each

comprising a casing, heating means of the open flame type within the casing, a hood overlying the casing and vertically spaced therefrom, means for supporting the hood in said relation, and *an air intake pipe opening into the space above the heating means* and extending through a side wall of the barn to receive fresh air, *whereby fresh air from the outside will be mixed in said hood with the heated gases from the burner and will thereby be conditioned before passing upwardly into the barn."* (Italics supplied). Not only does this language claim the invention as the resultant of the combination and not as a mere aggregation of devices, as did the abandoned claim, but it claims, as the abandoned claim did not, what is the heart of the invention, viz., the bringing of the air *under* the hood and above the flame. Of course, this was shown in the specification; but the abandoned claim did not so limit the use of the intake pipe. The abandoned claim was unquestionably bad on the references cited; claim 2 of the re-issue was not, as we have already pointed out; and the test on the question of recapture is whether the references that defeated the abandoned claim would defeat the claim of the re-issue. In re Wadsworth, 107 F.2d 596, 600, 27 C.C.P.A., Patents, 735.

The rule upon which defendant relies that one cannot claim upon re-issue a claim that he has abandoned upon the original application, like the rule that a narrow claim cannot be interpreted to cover the subject matter of a broad claim which has been abandoned, is grounded upon the principles of estoppel. Corbin Cabinet Lock Co. v. Eagle Lock Co., 150 U.S. 38, 14 S.Ct. 28, 37 L.Ed. 989; Leggett v. Avery, 101 U.S. 256, 25 L.Ed. 865; Keith v. Charles E. Hires Co., 2 Cir., 116 F.2d 46. It has application to positions knowingly and intentionally taken in pursuit of patent rights, and should not be extended to deprive a patentee of the substance of his invention where the re-issue claim cannot be said to be the same as the one abandoned. While mistake and inadvertance may not be relied on to relieve against the effect of cancellation (Leggett v. Avery, supra), certainly a court of equity, which or-

dinarily does relieve against mistake, should not extend the rule of estoppel beyond what is strictly required, where it is apparent that the claim cancelled is not identical with the one allowed and that to strike down the latter would be to deprive the patentee of the whole benefit of a meritorious invention. As was said by the Supreme Court in Topliff v. Topliff, 145 U.S. 156, 171, 12 S.Ct. 825, 831, 36 L.Ed. 658: "The object of the patent law is to secure to inventors a monopoly of what they have actually invented or discovered, and it ought not to be defeated by a too strict and technical adherence to the letter of the statute, or by the application of artificial rules of interpretation."

Whether the salutary rule which forbids the allowance upon re-issue of a claim which has been abandoned upon the original application should be applied to a claim which embodies the substance of the invention, we need not stop to inquire. This point does not seem to have been passed on. It would seem absurd, however, to say that under the statute patentee is entitled to relief because of inadvertence and mistake in failing to claim his invention but, under a court made rule, must be denied any real relief because through the same inadvertence or mistake he cancelled a claim in which the invention was embodied.

### Infringement

Little need be said on the subject of infringement. The air conditioning device made and sold by defendants for use in tobacco barns unquestionably embodies the heart of the Mayo invention. The fact that there are one or two minor differences, as in the manner of adjusting the hood and the opening on the sides, manifestly does not avoid infringement. Swain Turbine & Mfg. Co. v. Ladd, 102 U.S. 408, 26 L.Ed. 184; Crown Cork & Seal Co. v. Aluminum Stopper Co., 4 Cir., 108 F. 845; Frick Co. v. Lindsay, 4 Cir., 27 F.2d 59; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912. It is well settled that the making of patentable improvements over the invention does not avoid infringement, even though a patent be issued for them. The record shows direct infringement by the de-

fendant C. L. Hardy in the use of air conditioning devices in his own tobacco barns. The other defendants are guilty of contributory infringement in manufacturing and selling air conditioning devices to be used in infringing combinations. Henry v. Dick, 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645. There is nothing to the contrary in the decision in Mercoid Corporation v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376. That case merely applies the salutary rule that a combination patent may not be used to protect an unpatented part from competition. Nothing of that sort is involved here. What the defendants are doing is manufacturing and selling machinery with the knowledge, purpose and intent that it shall be used in a combination which will infringe. The case is one where plaintiff is using his patent not to monopolize the sale of what is not patented but to prevent defendants from aiding others to infringe what is patented. A clearer case of contributory infringement could not well be imagined than that presented by this record.

For the reasons stated, the judgment appealed from will be reversed and the cause will be remanded for further proceedings not inconsistent herewith.

Reversed and remanded.

SOPER, Circuit Judge (dissenting).

The curing of tobacco by heating and drying the air in the barn in which it is hung is as old as the industry itself; and the essential elements of the procedure have been known and used for a long time. They comprise the admission of air through openings in the walls of the barn near the floor and heating the air so that it will rise through the hanging tobacco suspended in the barn and pass out through a ventilator in the roof. Originally wood, and later coal, was burned in an outside furnace which imparted heat to pipes or flues placed inside the building below the tobacco whereby the inside air was heated to the proper temperature. When this method became too expensive by reason of the cost of fuel and the cost of tending the furnace, open flame oil burners placed inside the barn under a hood or casing were substituted.

The patentee in the pending case contributed none of these steps in the development of the art. The validity of the patent in suit depends on one thing only, that is, an air intake pipe let through the side walls of the barn to receive fresh air and conduct it to the space above the oil burners and beneath the hood. Even this device was not new in its entirety. The Smith Patent, No. 2,051,348, for example, showed an air intake pipe which discharged air in the vicinity of the burners but not directly into the space underneath the hood above the burners, although some of the air admittedly entered this space. The question for decision is whether this contribution amounted to invention. Devices equally this simple and obvious after the event have been accorded this rank. A classic example is Eibel Process Co. v. Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523, where the mere elevation in the pitch of an element in a machine was held to involve invention because it solved a problem that had vexed the industry and thereby turned failure into success.

Unfortunately for the patentee herein, there is no finding that the discharge of the air under the hood solved any problem or made any substantial improvement to the process of curing tobacco. The finding of the District Judge who saw the witnesses was quite to the contrary. He said: "There was some conflict in the testimony given with respect to any improvement in the quality when curing with oil stoves and using outside air directly heated in the oil stove, as compared with previous practices of curing, using coal or wood as the fuel, or using a heated flue. Certain of the witnesses testified that the use of oil stoves and the outside air directly heated thereby, gave more weight to the tobacco and thus increased the price which it brought at the warehouse. This testimony was not convincing. It was not based on any tests, experiments or observations of a character which would be necessary to prove that the practice of using oil burners and directly heated outside air gave added weight or better quality to the tobacco. Tobacco growers of experience testified that the use of oil stoves in the manner referred to did not result in any improvement in the qual-

ity of the tobacco, and did not cause it to bring a better price. In fact, it appears that there is no substantial variation in the resulting cured tobacco, no matter which of the methods or practices referred to is used. *The weight of the evidence is that the method of curing tobacco, using oil stoves and outside air heated over the flame and beneath the hood, brought no improvement in quality or price of the tobacco. The advantages of cheapness and convenience which were present in the use of oil stoves, are only those which might normally be expected.*" (Italics supplied.)

This finding is binding upon us. Federal Rule of Civil Procedure 52(a), 28 U.S.C.A. following section 723c, declares that "findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." None of us is able to say that this finding of the District Judge was clearly erroneous, as will appear from the discussion in the foregoing opinion of this court. The conclusion seems to be inevitable that the Florence-Mayo system of curing tobacco, effective and successful though it seems to be, does not involve the element of invention.

The question of patentability always involves the exercise of an informed judgment, and opinions may easily differ. There is, however, one feature of this case, fatal to the patent, which hardly seems to admit of a difference of opinion. It is the fact that the patentee in the course of the proceedings upon his original application for the patent abandoned a claim which included the one feature of the process above described upon which the validity of the patent depends. The claim in question was rejected by the Patent Office and the patentee acquiesced in its rejection and did not appeal. The law in such a situation was declared by the Supreme Court in Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp., 294 U.S. 477, 492, 55 S. Ct. 455, 461, 79 L.Ed. 1005, where it was said that "it has long been settled that a claim abandoned or rejected in the Patent Office with the acquiescence of the applicant cannot be revived in a reissued patent"; and in accordance with the rule it is held that one who acquiesces in a rejection of a claim, well knowing the significance of his act, is deemed to have abandoned the claim. Mahn v. Harwood, 112 U.S. 354, 359, 5 S.Ct. 174, 6 S.Ct. 451, 28 L.Ed. 665; Union Switch & Signal Co. v. Louisville Frog, Switch & Signal Co., 6 Cir., 73 F.2d 550, 552.

Claim 4 of the original patent which was abandoned in the Patent Office, and Claim 2 of the reissue patent, set out in the foregoing opinion of the court, cover the same ground, involve the same elements and are of equal breadth. Each of them calls for a tobacco curing building, a ventilating opening in the roof, supports for the tobacco in the structure and open flame oil burners with overlying hood. Each claim also described the feature on which the issue of invention depends. In claim 4 this element is described as "manually controlled air intake means connected to each hood and receiving air from the exterior of the building structure"; while claim 2 describes it in the following words: "An air intake opening into the space above the heating means and extending through a side wall of the barn to receive fresh air." Obviously these two descriptions are substantially the same, and if any lingering doubt on the point remains, it is resolved by the identical drawings which accompanied both the original and the reissue application which showed a pipe running from the exterior of the building through the wall and discharging the air into the space beneath the hood.

Claim 2 of the reissue also explains the reason why the outside air is conducted to the hood. The explanation is contained in the clause, "whereby fresh air from the outside will be mixed in said hood with the heated gases from the burner and will thereby be conditioned before passing upwardly into the barn." This clause does not appear in claim 4 of the original application. It is obvious, however, that the clause is immaterial to the issue of patentability and adds nothing thereto; for it is well settled, as will appear from decision of this court in DeStubner v. United Carbon Co., 4 Cir., 163 F.2d 735, 743, and the cases

cited therein, that, on the one hand, it is not necessary that a patentee understand the scientific basis for his invention and on the other hand, an explanation of the law controlling the operative steps of a process does not constitute invention.

The rule of patent law under discussion has a sound basis in that the abandonment of a claim or the failure of a patentee to cover an element of a device by a claim justifies the assumption that the matter disclosed but not claimed in the patent is within the public domain. In the instant case, the infringing device was put on the market before the grant of the reissue although after the application therefor had been filed.

I think the judgment of the District Court should be affirmed. It takes something more than the commercial success of a device and the imitation of one's product by a competitor to establish the validity of a patent.