HARRIS et al. v. NATIONAL MACHINE
WORKS, Inc., et al.

No. 3630.

United States Court of Appeals
Tenth Circuit.

Nov. 18, 1948.

Writ of Certiorari Denied Jan. 31, 1949.

See 69 S.Ct. 491.

John H. Bruninga, of St. Louis, Mo., and Charles M. McKnight, of Tulsa, Okl. (Philip B. Polster, of Collinsville, Ill., on the briefs), for appellants.

Roy C. Lytle, of Oklahoma City, Okl. and Robert F. Davis of Washington, D. C. (Keaton, Wells, Johnston & Lytle, of Oklahoma City, Okl., Stevens, Davis, Miller & Mosher, of Washington, D. C., and D. I. Johnston and D. C. Johnston, both of Oklahoma City, Okl., on the brief), for appellees.

Before PHILLIPS, Chief Judge, and BRATTON and HUXMAN, Circuit Judges.

PHILLIPS, Chief Judge.

National Machine Works, Inc.,[1] and Gerner brought this action against Harris and Calhoun, copartners doing business under the name of H-C Products Company, for infringement of Patent 2,403,520, and for unfair competition. The patent was applied for July 23, 1945, and granted July 9, 1946.

Gerner was an automobile mechanic. Harris was a salesman for automotive parts. Gerner conceived and designed a unit for repairing Chevrolet automobile transmissions. He worked out designs, drawings, and a rough model of the unit, which, in September, 1944, he disclosed to Harris. The disclosures were made with a view to arranging for sales of the device through Harris. After Harris had shown a model of the device to prospective customers and ascertained that it was saleable, he entered into a contract with Gerner on November 16, 1944, which gave Harris the exclusive right to sell the device during the life of the patent thereon. Gerner commenced the construction of a plant for the manufacture of the unit. However, by January, 1945, and before the plant was completed, Harris was ready to commence the sale and distribution of the unit. Gerner entered into an oral contract with the Calhoun Hydraulic Equipment Company, a copartnership consisting of Calhoun and his brother, Ingram Calhoun, to manufacture the device. Gerner turned over to Ingram Calhoun complete drawings and specifications of his device and a finished model thereof. The Calhoun Hydraulic Equipment Company manufactured and delivered to Gerner several hundred units. Harris, under the supervision of Gerner, prepared instruction sheets for installing the device in automobile transmissions. In the meantime, Gerner was corresponding with the Charter Institute of American Inventors, in which he held a membership. He sent the Institute full details respecting his invention and by so doing believed he was pursuing the proper procedure to apply for a patent. The Institute returned the material to Gerner and advised him it did not render services in procuring patents. Gerner then employed patent attorneys in Washington, D. C., and, through their services, procured the granting of the patent. After the patent issued, Gerner assigned it to National.

A dispute developed between Gerner and Harris respecting the share of the profits Harris was to receive under the contract. In an action brought by Harris against Gerner in the district court of Oklahoma County, Oklahoma, a judgment was entered on March 14, 1946, wherein it was adjudged that the contract was valid, that it would terminate as of April 1, 1946, and that Harris was entitled to recover from Gerner, $8,813.32. Gerner paid the amount awarded by the judgment. Prior to the judgment, he had paid Harris, $5,082.78.

Gerner began commercial production of the repair units in 1945 and since that time he and National have manufactured and sold them in substantial quantities and they have been used in the repair of Chevrolet automobiles and GMC trucks throughout the United States.

On July 1, 1945, Harris began to devote all his time to the sale and distribution of the Gerner unit. He secured manufacturer's agents throughout the United States, who in turn sold to jobbers. However, in December, 1945, Harris and Calhoun began making definite preparations to manufacture and sell a substantially identical repair unit to the trade in direct competition with Gerner. Harris and Calhoun acquired a knowledge of manufacturing costs, expenses, profits, customers, sales outlets, specifications, and drawings and obtained a model of the Gerner unit. As early as

---

[1] Hereinafter referred to as National.

February, 1946, Harris and Calhoun had built the first model of the accused device. It was substantially identical with the Gerner device. Knowing that Gerner had a patent application pending, Harris and Calhoun began the manufacture of the accused device and made efforts to sell it and did sell it to customers Harris had secured for Gerner while the Gerner-Harris contract was in effect.

While Harris was still in the employ of Gerner, and in exclusive charge of Gerner's sales, he contacted certain of Gerner's manufacturer's agents and undertook to induce them to discontinue their contracts with Gerner and represent Harris and Calhoun in the sale of the accused device. Harris and Calhoun prepared and distributed to the trade, catalog sheets and other literature and instructions for the installation of the accused device all similar to the Gerner literature and instructions. Harris and Calhoun offered a larger discount to jobbers than that allowed by Gerner.

Harris and Calhoun have manufactured, sold, and used, or caused to be used, the alleged infringing device which is substantially identical with the device of the patent in suit, and have acquired 60 per cent of the customers who were purchasing from Gerner on April 1, 1946.

From a judgment holding the patent valid and infringed, and Harris and Calhoun guilty of unfair trade practices and unfair competition, this appeal is prosecuted.

Chevrolet automobiles and trucks are constructed so that the motor drives the rear wheels by an enclosed universal joint and an enclosed drive shaft. The universal joint terminates in an internally splined stub shaft which fits over the forward end of the drive shaft which is externally splined. The drive shaft is enclosed in a drive shaft housing which extends forwardly over the rear end of the universal stub shaft. The forward end of the drive shaft is supported by a bearing mounted in the drive shaft housing. Immediately behind this bearing is a ring of flexible material that serves as an oil seal to prevent the oil in the universal joint from passing down through the drive shaft housing into the differential housing. At the extreme forward end of the drive shaft housing, there is another bearing that surrounds and supports the rear end of the stub shaft of the universal joint. After prolonged use, these bearings and seal become worn, and usually that portion of the drive shaft which revolves within its bearing and that portion of the stub shaft which revolves within its bearing become worn and scored. Previous to the conception of the Gerner device, in order to correct such conditions by repair, it was necessary to remove and replace the bearings, the seal, and the drive shaft, and, in some instances, the portion of the universal joint that includes the stub shaft. It is a relatively simple operation to disassemble the parts at the place where the universal joint couples with the drive shaft and to replace that part of the universal joint which carries the stub shaft and also replace its bearing. It is also possible to remove the drive shaft bushing and seal by driving them out of the forward end of the drive shaft housing. However, in order to remove the drive shaft, it is necessary to remove the differential from its housing and pull the drive shaft out of the rear end of the drive shaft housing. It is almost impossible to reassemble a differential thus removed and replace it in its housing so that it is properly aligned and will operate satisfactorily. Consequently, when a drive shaft is removed, it is necessary to replace a good many parts of the differential.

Gerner discovered that there was a sufficient distance between the original drive shaft bearing and the splines on the drive shaft to insert a journal for additional bearings. Accordingly, Gerner devised a repair unit embracing a sleeve about five and three-quarters inches long adapted to be inserted about the drive shaft and into the drive shaft housing ahead of the original, but worn, bearing and seal, bearings carried adjacent opposite ends of the sleeve on the interior thereof for sustaining the drive shaft and stub shaft, and a seal at the inward end of the sleeve to prevent oil in the universal joint from passing down through the drive shaft housing into the differential housing. When this unit is employed, it is unnecessary either to remove the drive shaft or to disassemble the differ-

ential, and it is unnecessary to remove the old drive shaft bearing and seal. The unit provides a new bearing and seal for the drive shaft on a new and unworn portion of the shaft and at the same time provides a replacement for the bearing that originally supported the stub shaft of the universal joint.

Before Gerner's device, it required five or six hours' work of a mechanic, at a cost of approximately $24, to make such repairs. With the Gerner unit, the repair can be effected in approximately one hour's time and the cost is approximately $9.75.

Claims 1, 2, and 3 of the original application were rejected on the ground that the only positive structure recited in the claims was a sleeve containing spaced bearings and a seal adjacent one of the bearings and one end of the sleeve, and were unpatentable over cited references.

Gerner then amended his claims so as to limit them to a repair unit insertable into an automobile propeller shaft housing, thus expressly restricting the use of the device to a specific environment where unusual and difficult problems were presented.

Claims 2 and 3 of the patent are typical of the claims. They read as follows:

"2. In an automotive vehicle, a propeller shaft housing, a propeller shaft rotatable in said housing, a journal for said shaft adjacent an end of said housing, a repair unit insertable in said end of said housing, said unit including an open ended sleeve tightly fitting in said housing and with a first end disposed adjacent said journal, a bearing in said sleeve adjacent said first end for journalling said shaft, and an oil seal received in the first end of said sleeve and positioned between said journal and said bearing.

"3. In an automotive vehicle, a propeller shaft housing, a propeller shaft rotatable in said housing, a journal for said shaft adjacent an end of said housing, a repair unit insertable in said end of said housing,

said unit including an open ended sleeve tightly fitting in said housing and with a first end disposed adjacent said journal, a bearing in said sleeve adjacent said first end for journalling said shaft, and a cylindrical member splined upon the end of said shaft and a second bearing in a second end of said sleeve and journalling said cylindrical member."

At the time Gerner conceived his device, sleeves containing spaced bearings and oil seals were well known in the art. Moreover, viewed in retrospect, Gerner's conception seems comparatively simple. But, a new combination of old elements may amount to invention and the fact that, viewed in retrospect, a conception seems simple, does not justify denial of inventive genius where the need for the device long existed and the solution of the problem did not occur either to mechanics skilled in the art or to experts in the automotive engineering field.[2] The facts are that prior to Gerner's device mechanics skilled in the art had been repairing worn drive shafts and worn drive shaft bearings in Chevrolet automobiles and GMC trucks by the only known method; and, notwithstanding repair by that method was more difficult, took substantially longer, and cost substantially more than repair with Gerner's device, the Gerner conception apparently never occurred to such mechanics. Gerner's device enjoyed immediate and substantial financial success. While it is a combination of old elements, it accomplishes, if not a new, an old result in a more facile, economical, and efficient way in a particular environment which presented peculiar and difficult problems. None of the sleeves containing spaced bearings and oil seals disclosed in the prior art was designed for a solution of the problem accomplished by Gerner's device. Finally, the presumption of validity arising from the granting of the patent by the Patent Office is strengthened by the additional presumption arising from the fact that the invention filled a want pre-

2 Dow Chemical Co. v. Williams Bros. Well Treating Corporation, 10 Cir., 81 F.2d 495, 496, 497;

The Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Beat .'Em All Barbed-Wire Co.), 143 U.S. 275, 283, 12 S.Ct. 443, 36 L.Ed. 154;

Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 168 F.2d 778, 781.

sented by a new situation, that it entered into immediate use, and that it met with substantial commercial success.

The totality of these considerations leads us to the conclusion that the patent is valid.[3]

Before the application for the patent had actually been filed, Gerner recited in the contract with Harris that a patent application was pending and he printed on certain of the cartons containing repair units the words "Patent Applied For." But, in so doing, Gerner acted innocently and no injury to third persons resulted therefrom.

After the patent issued, Gerner printed on the cartons containing his repair unit, the patent number and represented to third persons that the repair unit per se was protected by the patent. And it is urged that Gerner and National should have been denied relief under the doctrine announced in Mercoid Corporation v. Mid-Continent Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376.

█ It seems clear to us that claim 2 and the other claims of which it is typical are for a repair unit per se. The insertion in such claims of references to certain parts of the transmission mechanism of an automobile was not for the purpose of embodying such parts as elements of the claimed combination, but for the purpose of more accurately describing and defining the repair unit by showing the parts of the transmission assembly into which it was to fit and with which it was to operate when installed, and by limiting its use to a particular environment where unusual and difficult problems had arisen. That, we think was approved practice.[4]

That it was the intention to limit all the claims to the repair unit, we think indubitably appears from the language of the specification which describes the device as a replacement part adapted for installation in the drive shaft housing of a motor vehicle and as embodying a sleeve adapted to fit into the forward end of the drive shaft housing of an ordinary motor vehicle, bearings carried adjacent opposite ends of the sleeve on the interior thereof for sustaining the drive shaft in axial alignment with the sleeve and with the housing thereof, and a seal carried within the inner end of the sleeve and adapted effectively to prevent the flow of lubricants from the transmission and forward end of the drive shaft housing back through the rear end of such housing and into the differential housing. The specifications further state that the invention relates "particularly to a replacement part adapted for installation in the * * * drive shaft housing of a motor vehicle" and that the object of the invention is to provide new support for the forward end of the propeller shaft when its bearings have become worn through use and to prevent the lubricant in the transmission gears from escaping through the drive shaft housing into the differential housing.

█ It is well settled that the specification and claims of a patent constitute a contract between the United States and the patentee and they should be read and construed together, not for the purpose of limiting, contracting, or expanding the claims, but for the purpose of ascertaining from the entire agreement the actual intention of the parties.[5]

Hence, we conclude that Gerner obtained a valid patent upon the repair unit per se and that Harris and Calhoun are guilty of direct infringement of claim 2, and the other claims of which it is typical.

█ Moreover, if claim 3 and the other claims which refer to "a cylindrical member splined up" the shaft, in describing the

---

[3] Stearns-Roger Mfg. Co. v. Ruth, 10 Cir., 62 F.2d 442, 446;

Williams Iron Works Co. v. Hughes Tool Co., 10 Cir., 109 F.2d 500, 506;

Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 168 F.2d 778, 781;

Skinner Bros. Belting Co. v. Oil Well Improvements Co., 10 Cir., 54 F.2d 896, 898;

Ratigan v. Deckard Supply Co., 10 Cir., 91 F.2d 722, 724.

[4] See Williams Mfg. Co. v. United States Shoe Machinery Corporation, 316 U.S. 364, 368, 369, 62 S.Ct. 1179, 86 L.Ed. 1537.

[5] Tschappat v. Hinderliter Tool Co., 10 Cir., 98 F.2d 994, 998;

Jensen-Salsbery Laboratories v. O. M. Franklin B. Serum Co., 10 Cir., 72 F.2d 15, 19.

repair unit, are construed as including such cylindrical member as an element of the patented combination, Harris and Calhoun would be guilty of contributory infringement. That is true, because they are manufacturing and selling repair units with the knowledge, purpose, and intent that they shall be used in a combination which will infringe such claims. As stated above the accused device is identical with the repair unit covered by the patent and is designed exclusively for the repair of Chevrolet automobile and GMC truck transmission assemblies, which embrace a splined stub shaft—the cylindrical member—and all of the other automotive transmission parts, in addition to the repair unit per se, mentioned in such claims. In the instant case, Gerner and National are using the patent, not to monopolize the sale of what is not patented, but to prevent Harris and Calhoun from infringing and aiding others to infringe what is patented. The instant case falls within the doctrine of Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 168 F.2d 778, 784, 785, rather than the Mercoid case.

The facts found by the trial court, which are supported by substantial evidence and binding on this court,[6] fully support the conclusion that Harris and Calhoun were guilty of unfair trade practices and unfair competition.

The judgment is affirmed.

---

[6] McElroy v. Pegg, 10 Cir., 167 F.2d 668, 670.